**Peng–Fei SI, Petitioner,**

v.

**William SLATTERY, District Director of the United States Immigration and Naturalization Service, New York District, Respondent.**

No. 93 Civ. 8069 (MGC).

United States District Court, S.D. New York.

Oct. 13, 1994.

Jerome N. Frank Legal Services Organization, New Haven, CT by Carroll L. Lucht, Jean Koh Peters, Stephen Wizner, Jacqueline Becerra, Wesley Hsu, Stanley Hsue, Jane Park, Arlene Roberts, and Cecillia Wang, for petitioner.

Mary Jo White, U.S. Atty., S.D.N.Y., New York City by F. James Loprest, Jr., Sp. Asst. U.S. Atty., for respondent.

## OPINION

CEDARBAUM, District Judge.

Peng–Fei Si, a citizen of the People's Republic of China ("PRC") who has been ordered excluded from the United States, petitions this court for a writ of habeas corpus. Si argues that the Board of Immigration Appeals ("BIA") relied on an improper legal standard in dismissing his appeal from the Immigration Judge's ("IJ") determination that he did not qualify for asylum or withholding of deportation based on his fear that he will be forcibly sterilized if he is sent back to the PRC. Si also argues that asylum or withholding of deportation based on his fear of persecution arising from membership in a social group comprised of those persons who had fled the PRC aboard the Golden Venture was improperly denied. For the reasons discussed below, Si's petition for a writ of habeas corpus is denied.

### Background

Si arrived in the United States on June 6, 1993 aboard the Golden Venture, a ship which ran aground in Queens carrying approximately 300 people who had fled the PRC. Si was immediately apprehended by law enforcement officials, and has been detained by the Immigration and Naturaliza-

tion Service ("INS") since that time. Si's central claim for asylum and withholding of deportation is based on his fear that if he returns to the PRC he will be forcibly sterilized in accordance with the PRC's "one couple, one child policy." Si has a wife and a son, both of whom are still in the PRC.

The following facts were presumed to be true by the IJ for the purpose of deciding Si's applications. *See* Oral Decision of IJ, at 11–12 (Sept. 3, 1993) (Rec. at 82–83). Shortly after the birth of Si's son, family planning officials began to pressure Si and his wife to have no more children. Because Si's wife had a medical condition which would not permit her to undergo any sort of operation, the officials demanded that Si be sterilized. Si attempted to avoid sterilization by pleading with the officials who came to his house on several occasions and eventually by giving the officials a $3,000 deposit to postpone the operation.

In February of 1992, more than ten officials came to Si's house to demand that he be sterilized. However, Si had been warned by a friend that they were coming, and fled before they arrived. Initially, Si hid from the officials at his aunt's house. Later, he made arrangements to be smuggled out of the country. Si went to Burma, Thailand, and Kenya before he boarded the Golden Venture which brought him to the United States.

On September 3, 1993, after conducting a hearing, the IJ denied Si's request for asylum and withholding of deportation and ordered him excluded. In denying Si's claim based on his fear of forced sterilization, the IJ relied on *Matter of Chang*, Int. Dec. 3107, 1989 WL 247513 (BIA May 12, 1989), a decision which Si contends has been overruled. On November 17, 1993, the BIA, also relying on *Chang*, dismissed Si's appeal. Thereafter, Si filed a petition for a writ of habeas corpus.

On August 17, 1994, this action was remanded to the INS for reconsideration of Si's requests for asylum and withholding of deportation in accordance with instructions that had just been issued by the Deputy Commissioner of the INS.[1] On August 31, 1994, the

parties each moved for clarification of the August 17, 1994 order to confirm that this court retained jurisdiction to decide whether the IJ and the BIA applied an improper legal standard in determining Si's claims. Those motions are hereby granted to the extent that I now address the law applied by the IJ and BIA in denying Si's requests for asylum and withholding of deportation.

## Discussion

■ The BIA's conclusions of law are reviewed de novo. *Doherty v. Thornburgh*, 750 F.Supp. 131, 135 (S.D.N.Y.1990), *aff'd*, 943 F.2d 204 (2d Cir.1991), *cert. dismissed*, —— U.S. ——, 112 S.Ct. 1254, 117 L.Ed.2d 485 (1992). Its factual findings, however, are given considerable deference. *See* 8 U.S.C. § 1105a(a)(4) (findings of fact are conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole"); *Sotelo–Aquije v. Slattery*, 17 F.3d 33, 35 (2d Cir.1994). The Supreme Court, in *INS v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), stated that a petitioner seeking reversal of a BIA factual determination must show "that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Id.* at ——, 112 S.Ct. at 817.

In order to be eligible for asylum, Si must establish that he has "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A); 1158(a). The standard for withholding of deportation is similar, but sets a higher burden of proof. *See* 8 U.S.C. § 1253(h); *Sotelo–Aquije*, 17 F.3d at 38 (alien must demonstrate a "clear probability" of persecution). Therefore, the following discussion will focus on Si's claim for asylum.

### I. Forced Sterilization

In 1989, the BIA decided *Matter of Chang* which addressed the issue of whether a person who feared returning to the PRC because of its policy of forced sterilization was eligible for asylum. The BIA held that:

---

1. *See infra* pp. 405–406.

We cannot find that implementation of the "one couple, one child" policy in and of itself, even to the extent that involuntary sterilizations may occur, is persecution or creates a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." This is not to say that such a policy could not be implemented in such a way as to individuals or categories of persons so as to be persecution on account of a ground protected by the Act. To the extent, however, that such policy is solely tied to controlling population, rather than as a guise for acting against people for reasons protected by the Act, we cannot find that persons who do not wish to have the policy applied to them are victims of persecution or have a well-founded fear of persecution within the present scope of the Act.

*Id.,* 1989 WL 247513. Thus, an alien whose fear of persecution is based on forced sterilization is not eligible for asylum, unless he can demonstrate, for example, "that the policy was being selectively applied against members of particular religious groups or was in fact being used to punish individuals for their political opinions." *Id.*

Si has not asserted that the family planning officials singled him out to be sterilized because of any religious or political belief that he held, and therefore does not argue that he qualifies for asylum under *Chang.* Instead, Si argues that the BIA should not have applied *Chang* because it has been overruled. Specifically, Si argues that interim regulations promulgated by the Attorney General in 1990 ("1990 Interim Regulations"), an executive order issued by President Bush ("Executive Order 12,711"), and final regulations promulgated by the Attorney General in 1993 ("1993 Regulations") established that the fear of forced sterilization in and of itself is a ground for asylum, and thereby overruled the BIA's holding in *Chang.* The Government argues that *Chang* is still controlling authority, and that therefore, Si's requests for asylum and withholding of deportation were properly denied.

■ Si argues that the BIA's holding in *Chang* is no longer binding because it has been overruled by the Attorney General in the 1990 Interim Regulations. *See* 8 C.F.R. § 3.1(g). Those regulations, which became effective on January 29, 1990, amended 8 C.F.R. § 208 and set forth standards for evaluating claims for asylum and withholding of deportation based on coercive family planning policies. 55 Fed.Reg. 2803 (1990). According to those regulations, "[a]liens who have a well-founded fear that they will be required to abort a pregnancy or to be sterilized because of their country's family planning policies may be granted asylum on the ground of persecution on account of political opinion." *Id.* § 208.5(b)(1).

However, the 1990 Interim Regulations were not included in the final regulations which were issued on July 27, 1990 and became effective on October 1, 1990. *See* 55 Fed.Reg. 30,674 (1990). Those final regulations amended 8 C.F.R. § 208 and outlined the eligibility requirements for asylum and withholding of deportation, but did not make any reference to coercive family planning policies and made no mention of the 1990 Interim Regulations. Thus, Si cannot rely on the 1990 Interim Regulations which were effectively revoked by their omission from the final regulations issued in July of 1990. *See Chen v. Slattery,* 862 F.Supp. 814, 821 (E.D.N.Y.1994); *Di v. Carroll,* 842 F.Supp. 858, 869 (E.D.Va.1994).[2]

■ Si also argues that *Chang* was superseded by Executive Order 12,711, issued by President Bush on April 11, 1990. 55 Fed. Reg. 13,897 (1990). Section 4 of the Executive Order provides that:

> The Secretary of State and the Attorney General are directed to provide for enhanced consideration under the immigration laws for individuals from any country who express a fear of persecution upon return to their country related to that country's policy of forced abortion or coerced sterilization, as implemented by

---

**2.** Although Si has presented some evidence which suggests that the omission may have been inadvertent, that evidence is inconclusive. Indeed, the fact that the omission was not subsequently reversed suggests that it was not inadvertent.

the Attorney General's regulation effective January 29, 1990.

Thus, according to Si, his applications for asylum and withholding of deportation are entitled to "enhanced consideration," and the BIA erred in following *Chang.*

■ However, as recognized by Si, "there is no private cause of action to enforce obligations imposed on executive branch officials by executive orders." (Pet.Mem. at 10 n. 2); *see Haitian Refugee Center, Inc. v. Baker,* 953 F.2d 1498, 1510–11 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992). Si contends that his argument is unaffected by that principle in that he does not seek to force the Attorney General to comply with the Executive Order because the Attorney General has already implemented the Executive Order by promulgating the 1990 Interim Regulations. That argument, however, highlights the fact that the Executive Order itself did not overrule *Chang.* Accordingly, Si is left to rely on the 1990 Interim Regulations which implemented the provisions of the Executive Order. But, as stated above, the 1990 Interim Regulations were revoked in July of 1990.

Si's contention that Executive Order 12,711 gave the 1990 Interim Regulations the force of law, and thereby made their omission from the final regulations irrelevant, is not persuasive. Executive Order 12,711 directs the Attorney General to give enhanced consideration to asylum claims based on coercive family planning policies. The fact that the Attorney General may have failed to comply with that order by omitting the 1990 Interim Regulations from the final regulations does not mean that Si may rely directly on the Executive Order. Rather, Si may rely only on those regulations that the Attorney General in fact issued.

■ Finally, Si argues that the 1990 Interim Regulations were put into final form in January of 1993 and were thus in effect when he made his applications for asylum and withholding of deportation. The 1993 Regulations were upheld as enforceable in *Zhang v. Slattery,* 859 F.Supp. 708, 712 (S.D.N.Y. 1994), but were rejected in *Chen,* 862 F.Supp. at 822. A brief review of the history of the 1993 Regulations is necessary to determine the effect of those regulations.

On January 22, 1993, then Attorney General William Barr submitted to the Federal Register a "Final Rule" regarding claims for asylum and withholding of deportation made by aliens fleeing countries with coercive family planning policies. That regulation amended 8 C.F.R. § 208.13(b)(2)(ii) [3] to provide the following:

> An applicant (and the applicant's spouse, if also an applicant) shall be found to be a refugee on the basis of a well-founded fear of persecution on account of political opinion if the applicant establishes a well-founded fear that, pursuant to the implementation by the country of the applicant's nationality or last habitual residence of a family planning policy that involves or results in forced abortion or coerced sterilization, the applicant will be forced to abort a pregnancy or to undergo sterilization or will be persecuted for failure or refusal to do so, and that the applicant is unable or unwilling to return to, or to avail himself or herself of the protection of, that country because of such fear.

(Letter from Attorneys for Petitioner to Judge Cedarbaum, Ex. A at 14 (April 11, 1994)). The public comments that had been received regarding the 1990 Interim Regulations were addressed in the explanatory notes accompanying the 1993 Regulations.[4]

---

3. The 1990 Interim Regulations amended 8 C.F.R. § 208.5 which set forth the standards for establishing a claim for asylum. The final regulations issued in July of 1990 amended the same provisions, but at a newly numbered section, 8 C.F.R. § 208.13. Thus, the 1993 Final Regulations were intended to amend the same provisions as the 1990 Interim Regulations.

4. Si contends that the fact that the comments to the 1990 Interim Regulations were addressed in

the notes to the 1993 Final Regulations shows that the Attorney General considered the 1990 Interim Regulations to be in effect "during a three-year notice and comment period" and that therefore the final regulations published in July of 1990 did not supersede the 1990 Interim Regulations. (Pet.Mem. for Clarif. at 4–5.) That argument is without merit. The 1990 Interim Regulations provided that the notice and comment period would expire on February 28, 1990, and there is no evidence to suggest that the 1990

The notes state that "[o]ne effect of this rule is to supersede the Board decision in *Matter of Chang* . . . to the extent that it held that the threat of forced abortion or involuntary sterilization pursuant to a government family planning policy does not give rise to a well-founded fear of persecution on account of political opinion, without an additional showing on the issue of the applicant's actual political opinion." (*Id.* at 4–5.)

The 1993 Regulations provided that the "effective date" of the regulations would be the date of publication in the Federal Register, which was scheduled for January 25, 1993. (*Id.* at 2, 16.) However, immediately following his inauguration on January 22, 1993, the same day on which the 1993 Regulations were submitted to the Federal Register, President Clinton directed the newly-appointed Director of the Office of Management and Budget to issue a memorandum to the heads of all federal government agencies. That memorandum stated that "[i]t is important that President Clinton's appointees have an opportunity to review and approve new regulations," and thus requested that each agency "withdraw from the Federal Register for approval [by the newly appointed agency heads] all regulations that have not yet been published in the Federal Register. . . ." 58 Fed.Reg. 6074 (1993). Accordingly, the Acting Assistant Attorney General withdrew from publication the 1993 Regulations.

Si argues that the 1993 Regulations are binding and that therefore *Chang* has been overruled. While Si recognizes that those regulations were withdrawn from publication, he contends that a regulation need not be published in order to have binding effect. For this proposition Si relies on *Montilla v. INS,* 926 F.2d 162 (2d Cir.1991), in which the Second Circuit stated:

> As the Supreme Court noted, "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required,"

and even though the procedural requirement has not yet been published in the federal register.

*Id.* at 167 (quoting *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974)) (emphasis added). However, the emphasized language on which Si relies is dictum in that the *Montilla* court held that the INS was required to follow a *published* rule which involved an alien's right to counsel.

The case relied upon by the *Montilla* court, *Morton v. Ruiz,* did involve an unpublished rule, but the facts in *Morton* are very different from those in the present case. In *Morton,* members of an Indian tribe who lived off the reservation applied to the Bureau of Indian Affairs ("Bureau") for general assistance benefits. Their applications were denied on the basis of unpublished eligibility requirements issued by the Bureau. The Supreme Court discussed the effect of a rule found in the Bureau of Indian Affairs Manual, an unpublished "internal-operations brochure," which required that all directives that inform the public of eligibility requirements be published in the Federal Register in accordance with the Administrative Procedure Act ("APA"). *Morton,* 415 U.S. at 234–35, 94 S.Ct. at 1074. The *Morton* Court held that the Bureau must comply with its own internal unpublished procedures, which required publication of eligibility requirements, before it could declare a person ineligible for benefits. Thus, the Court concluded that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Id.* at 235, 94 S.Ct. at 1074.

The facts of the present case are very different. First, unlike *Morton,* this case does not present a situation in which an agency simply has not published its internal procedures in the Federal Register. Indeed, not only were the 1993 Regulations never published in the Federal Register, they were affirmatively withdrawn from publication by the Acting Attorney General for review and possible approval by President Clinton's ap-

---

Interim Regulations remained in effect in spite of their omission from the final regulations issued in July of 1990. If anything, the promulgation of the 1993 Final Regulations demonstrates that the

Attorney General recognized that the 1990 Interim Regulations and Executive Order 12,711 had not effectively overruled *Chang.*

pointed Attorney General. There has been no such approval in the more than twenty months since the withdrawal. In fact, an opportunity to formally adopt the 1993 Regulations and to direct the BIA to cease relying on *Chang* arose last year when the BIA referred to Attorney General Janet Reno two cases which had relied on *Chang*[5] in order to resolve the conflict between *Chang* and Executive Order 12,711. On December 7, 1993, the Attorney General stated that "it is apparent that the BIA's determination in these cases do[es] not require a determination that one or the other of these standards is lawful and binding." *Di v. Carroll*, 842 F.Supp. at 870 n. 23. Although, as noted by the *Chen* court, that statement is somewhat cryptic in light of the inherent conflict between Executive Order 12,711 and *Chang*, it is clear that the Attorney General has not decided to adopt the 1993 Regulations. Unless and until the Attorney General decides to adopt those regulations, they have no binding effect.

Second, the 1993 Regulations have never been followed by the BIA and thus cannot be regarded as a policy or procedure of the agency. In contrast, the Bureau's internal operations manual in *Morton*, which directed that all eligibility requirements be published, clearly represented the policy adopted by the Bureau. The Court in *Morton* simply enforced the unpublished policy to ensure that all persons affected would have notice of eligibility requirements for available benefits. Therefore, neither *Montilla* nor *Morton* provides support for Si's position.

In *Zhang*, the court relied on § 3 of the APA, the "Freedom of Information of Act" ("FOIA"), in holding that the 1993 Regulations need not be published in order to have binding effect. That section provides, in part, that "a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1). Si relies on several cases which construe that language to support his argument that the 1993 Regula-

tions are effective despite their withdrawal from the Federal Register. However, a careful reading of those cases demonstrates that they have no application to this case.

Si cites *Donovan v. Wollaston Alloys, Inc.*, 695 F.2d 1 (1st Cir.1982), in which the First Circuit held that an inspection program promulgated by the Occupational Safety and Health Administration ("OSHA") was valid even though it had not been published in the Federal Register. The court stated that because the defendant had failed to demonstrate how it had been adversely affected by OSHA's failure to publish the details of the program, the failure to publish would not render the program invalid. *Id.*, 695 F.2d at 9. Si also cites *Hogg v. United States*, 428 F.2d 274 (6th Cir.1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 805 (1971), in which the defendant claimed that certain internal Department of Justice instructions regarding the filing of an appeal by an Assistant United States Attorney were ineffective because they had not been published in the Federal Register in accordance with the APA. The Sixth Circuit held that the unpublished instructions were valid because "the requirement for publication attaches only to matters which if not published would adversely affect a member of the public." 428 F.2d at 280.

▆ Neither *Hogg* nor *Donovan* has any application to the present case. In both *Hogg* and *Donovan* there was no question that the unpublished regulations represented the policy of the agency in question. The only question presented to those courts was whether those regulations had to be published in order to be effective. That determination was made in accordance with the FOIA which requires publication of all regulations which, if not published, would adversely affect the public. None of the authority cited by Si stands for the proposition that an agency is bound to follow a rule that it has never before followed and that it in fact withdrew from publication, and thereby affirmatively decided not to adopt. The purpose of the FOIA is to ensure that all persons who

---

5. *Matter of Chu*, A71–824–281 (BIA June 7, 1993); *Matter of Tsun*, A71–824–320 (BIA June 7, 1993).

may be affected by a particular regulation have notice of its provisions. The FOIA cannot be used to force an agency to adopt a new regulation that it withdrew from publication for the specific purpose of determining whether or not it should be adopted.

Although the Justice Department's apparent indecision regarding the treatment of applications for asylum based on the PRC's "one couple, one child" policy is frustrating, the BIA's consistent application of *Chang* and the Attorney General's failure to effectively overrule that decision cannot be ignored. The court's holding in *Di v. Carroll* that the "cacophony of administrative voices" is undeserving of deference, 842 F.Supp. at 870, is not persuasive. As the *Chen* court stated, "inconsistency of policy is not, by itself, sufficient to require less deference to an agency's determination. An interpretation will be rejected only where it is unreasonable and at odds with the plain meaning of the statute." *Chen,* 862 F.Supp. at 821; *see Himes v. Shalala,* 999 F.2d 684, 690–91 (2d Cir.1993) (according deference to Secretary's interpretation of statute even though inconsistent with prior interpretation because current interpretation was "not at odds with the plain meaning of the statute [and was] reasonable"); *see also Osorio v. INS,* 18 F.3d 1017, 1022 (2d Cir.1994) ("we will reverse the BIA's interpretation of statutory law where 'it appears from the statute or its legislative history' that the interpretation is contrary to Congress's intent") (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984)).

■ The BIA's interpretation in *Chang* of the statute governing asylum claims is not unreasonable, and is consistent with the Supreme Court's interpretation of that statute. The Supreme Court, in *Elias–Zacarias,* held that a guerilla organization's use of threats of violence to coerce a person into joining its forces in fighting the Guatemalan government did not constitute "persecution on account of ... political opinion," as defined in 8 U.S.C. § 1101(a)(42). The Supreme Court found that even assuming that the applicant's resistance to joining the guerilla forces could

be seen as a political opinion, he had failed to demonstrate that the resulting persecution was "on account of" that political opinion, rather than because of his refusal to join with them. *Elias–Zacarias,* 502 U.S. at ——, 112 S.Ct. at 816.

■ Thus, even assuming that refusal to cooperate with family planning officials in the PRC can be characterized as an imputed political opinion, an applicant would still need to demonstrate that the policy was being enforced against him "on account of" that opinion, rather than to enforce the "one couple, one child" policy. The BIA, in *Chang,* simply held that an alien, in order to establish a claim for asylum, would have to show that forced sterilization was threatened for some motive other than enforcement of the population control policy. It cannot be said that that standard is at odds with the plain meaning of the asylum provisions. *But see Di v. Carroll,* 842 F.Supp. at 871–74 (finding that the PRC's confiscation of applicant's property and destruction of his living quarters after his refusal to comply with one-child policy constituted persecution on account of applicant's political opinion). While the PRC's policy of forced sterilization may seem cruel, the asylum laws do not provide relief on such grounds.

In sum, Si has failed to demonstrate that *Chang* has been overruled or that the BIA's interpretation of the asylum provisions is at odds with the plain meaning of the statute. Therefore, the denial of Si's application for asylum cannot be overturned by this court. Nor was the denial of Si's application for withholding of deportation based on an error of law.

■ However, Si is not necessarily subject to immediate deportation. New instructions issued by the INS demonstrate that Si may be entitled to a stay of deportation or parole based on his fear of forced sterilization. Those instructions provide, in part, that:

While asylum may not be available in most cases, the more extreme practices sometimes employed in the enforcement of family planning policies in the PRC can give rise to difficult cases where, for humanitar-

ian reasons, INS may not wish to repatriate the alien. In order to address the genuine humanitarian issues that exist in such cases, prior to removing such alien with a final order of exclusion or deportation, consideration will be given to granting such an alien a stay of deportation. (Letter from Asst. U.S. Attorney Loprest to Judge Cedarbaum, Ex. A at 2 (August 11, 1994).) Those instructions provide further that "[a]ll PRC nationals who have expressed a fear of return relating to the enforcement of family planning practices in the PRC may, at the discretion of the District Director, be released from INS custody or paroled into the United States pending final resolution of their immigration proceedings." (*Id.* at 4.)

## II. *Golden Venture Passengers*

■■ Si also argues that he has a well-founded fear of persecution based on his "membership in a particular social group," comprised of those persons who fled the PRC aboard the Golden Venture. Si contends that the PRC was embarrassed by the publicity surrounding their escape and will therefore punish them more severely upon their return. According to Si, that punishment is likely to include harsh fines and a period of time in a "re-education" camp.

The Second Circuit has defined the term "social group" as:

> " 'a collection of people closely affiliated with each other, who are actuated by some common impulse or interest.' A particular social group is comprised of individuals who possess some fundamental characteristic in common which serves to distinguish them in the eyes of a persecutor—or in the eyes of the outside world in general."

*Gomez v. INS,* 947 F.2d 660, 664 (2d Cir. 1991) (quoting *Sanchez–Trujillo v. INS,* 801 F.2d 1571, 1576 (9th Cir.1986)). The *Gomez* court stated further that " '[a] particular social group normally comprises persons of similar background, habits or social status.' " *Id.,* 947 F.2d at 664 (quoting *Ananeh–Firempong v. INS,* 766 F.2d 621, 626 (1st Cir. 1985)).

The fact that the passengers on the Golden Venture each happened to choose the same method of fleeing the PRC, and now share the misfortune of having attracted a great deal of publicity which caused the PRC embarrassment, does not give them the status of a social group. There is no evidence that the Golden Venture passengers were "actuated by some common impulse or interest." Indeed, it is likely that the passengers decided to flee for many different reasons, and thus were brought together simply because each passenger happened to board the same vessel. While the Golden Venture passengers may be seen as a "group" by the PRC, they do not meet the requirements of a "social group" simply on the basis of their shared misfortune.

■■ Si also argues that in determining whether he has a well-founded fear of persecution, the IJ failed to "give due consideration to evidence that the [PRC] ... persecutes its nationals or residents if they leave the country without authorization or seek asylum in another country." 8 C.F.R. § 208.13(b)(2)(ii); *see Osorio,* 18 F.3d at 1031–32. The IJ considered and rejected Si's argument based on that regulation, as did the BIA. In order to prevail, Si must demonstrate "that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias–Zacarias,* 502 U.S. at ——, 112 S.Ct. at 817.

■■ Si acknowledges that to establish a claim for asylum based on the circumstances surrounding his departure and his subsequent application for asylum, he must show that (1) his departure was politically motivated; and (2) the consequences he will face upon his return will be political in nature. Thus, potential prosecution for violating the PRC's illegal departure law on its face does not give rise to a fear of persecution within the meaning of the statute. In *Matter of Janus and Janek,* 12 I. & N. Dec. 866, 1968 BIA LEXIS 99 (BIA 1968), a case relied on by Si, the BIA found that an order of conviction for "Defection from the Republic of Czechoslovakia" imposed on an alien in absentia suggested that the punishment he would face upon return had political, rather than criminal, connotations. Although the alien had not publicly expressed his opposi-

tion to the government before his departure, the BIA found that he, as a member of the Communist Party "entrusted with the mission of propagandizing for the Communist government in the United States, showed his true political sentiments by defecting." *Id.*, 12 I. & N. at 875.

Si has not demonstrated that the harsh penalties that he fears will be imposed upon his return will be political in nature. Indeed, Si has offered no proof which suggests that he will be singled out for persecution because he left the PRC in opposition to the one-child policy. And, the fact that the Golden Venture passengers may be punished more severely because of the embarrassment caused to the PRC cannot be a basis for political asylum. If it were, it would mean that any time people fled a country in large numbers—for whatever reason—to enter the United States illegally, and thereby caused embarrassment to their country of origin, the basis for asylum would be established.

Because Si has not shown that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution, he has not shown either error of law or abuse of discretion.

### Conclusion

For the foregoing reasons, Si's petition for a writ of habeas corpus is denied.

SO ORDERED.