**SHAN MING WANG, Petitioner,**

v.

**William SLATTERY, District Director of the United States Immigration and Naturalization Service, New York District, and David Milhollen, Director of the Executive Office for Immigration Review and Chairman of the Board of Immigration Appeals, Respondents.**

No. 94 Civ. 3489 (CSH).

United States District Court,
S.D. New York.

Feb. 2, 1995.

---

4. See *United States v. Zafiro*, 945 F.2d 881 (7th Cir.1991), *aff'd* —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

Craig F. Wilson, Wilson & Associates, P.C., New York City, for petitioner Shan Ming Wang.

James F. Loprest, Jr., Mary Jo White, U.S. Atty., S.D.N.Y., New York City, for defendant William Slattery, Dist. Director of U.S. I.N.S., N.Y. Dist., and respondent David L. Milhollen, Director of Executive Office for Immigration Review.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Petitioner, Sham Ming Wang, a citizen of the People's Republic of China ("PRC") and a passenger on an ill-fated journey of the vessel "Golden Venture," brings this *habeas corpus* petition pursuant to 8 U.S.C. §§ 1105a(a)(10) and 1105a(b), to challenge an order of the Board of Immigration Appeals ("BIA") dismissing petitioner's appeal of the decision of an Immigration Judge ("IJ") denying his request for asylum and ordering him excluded from this country. Because I conclude that the BIA applied the correct legal standard to Wang's claim, his petition will be dismissed.

## BACKGROUND

Wang arrived in the United States when the ship on which he was travelling ran aground off the shore of Queens, New York on June 6, 1993. Immediately thereafter, Wang was apprehended by law enforcement officials and taken into the custody of the Immigration and Naturalization Service ("INS") where he remains to this day. On June 8, 1993 the INS charged Wang with being "excludable" pursuant to § 212(a) of the Immigration and Nationality Act of 1952 (the "Act"), 8 U.S.C. §§ 1182(a)(7)(A)(i)(I) (Supp. IV 1992), and commenced exclusion proceedings against him. Wang, in turn, filed an application seeking asylum and withholding of deportation on the basis that he fears persecution if he returns to the PRC because of his opposition to its coercive family planning policies. A hearing on his application was held on June 23, 1993.

On the basis of Wang's testimony, which the IJ deemed credible, the IJ found the following facts. At the time of his exclusion hearing, Wang was 26 and married with one child. When his wife became pregnant with their second child in July of 1990, she unsuccessfully endeavored to conceal the pregnancy from the family planning authorities. When the authorities discovered her condition, they required her to have an abortion in October of 1990 and thereafter demanded that she be sterilized. Not willing to be subjected to such treatment, his wife fled the PRC for the United States in December of 1990.

The authorities did not restrict their punishment to Wang's wife. Wang was fined for violation of the policy, assigned to dangerous and undesirable work at a government-owned factory, and was informed that he must undergo forced sterilization if his wife did not return to the PRC for sterilization before December of 1992. In reaction to these measures, in early 1993 Wang departed China bound for the United States.

1. The petitioner technically appeals from the BIA's denial of his motion to reopen the proceedings which is governed by an abuse of discretion standard of review. *See INS v. Doherty,* 502 U.S. 314, 321–25, 112 S.Ct. 719, 724–25, 116 L.Ed.2d 823 (1992). Nonetheless, I also have jurisdiction

On September 16, 1993, the IJ issued a decision holding Wang ineligible for asylum or withholding of deportation. Applying a decision by the BIA, *Matter of Chang,* Interim Decision No. 3107, 1989 WL 246513 (BIA May 12, 1989), the IJ held that Wang failed to demonstrate that the PRC's family planning policy had been applied invidiously against him or his wife, that he was disproportionately punished for his violation of the policy, or that its implementation against him was aimed to punish him for his political belief or opinion. As such, Wang failed to demonstrate persecution on the basis of his political opinion, as required under the asylum statute. The IJ accordingly denied his claim for asylum and ordered Wang excluded. *See* Certified Administrative Record of the Proceedings ("R") at 55.

The BIA affirmed the IJ's decision by opinion dated November 18, 1993, concluding that the IJ had properly applied *Chang* and had correctly concluded that Wang failed to offer evidence of persecution on the basis of his political opinion. R at 23. On March 24, 1994, the BIA denied Wang's motion to reopen and reconsider the order of exclusion on the basis of two subsequent pronouncements concerning the issue. R at 1. Wang thereafter filed the present *habeas corpus* petition[1] and moved to preliminarily enjoin the INS from deporting him pending consideration of his petition before this Court. The parties thereafter agreed to a stay of deportation and the motion for a preliminary injunction became moot.

## DISCUSSION

Wang principally contends that the BIA and the IJ erroneously applied *Chang* because it had been overruled by subsequent pronouncements of the Attorney General and the President. Wang further argues that *Chang* is itself an improper decision because it violates the asylum statute by precluding individual determinations of persecution based upon consideration of the facts of each

to review the underlying merits of the order of exclusion. *See Padilla–Agustin v. INS,* 21 F.3d 970, 973 (9th Cir.1994) (court has jurisdiction to review underlying order of BIA where applicant filed single appeal after denial of motion to reopen proceedings).

application. The issue for this Court is whether *Chang* remains in effect and if so, whether it is a reasonable interpretation of the asylum law. Because Wang does not argue that his asylum application should have, or could have, been granted under the rule announced in *Chang*, this Court is not asked to determine whether the IJ and the BIA properly applied *Chang* to the facts presented in this case.[2]

*Asylum and Withholding of Deportation Standards*

■ An alien who arrives in the United States without the valid documentation set forth in § 1182(a)(7) of the Act shall be excluded from the United States unless he is eligible for "asylum" or "withholding of deportation." In order to qualify for asylum under 8 U.S.C. § 1158, an applicant must establish that he "is unable or unwilling to return to [his country of origin] ... because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." An asylum applicant bears the burden of demonstrating on the basis of the evidence that he faces a reasonable possibility of persecution for one of the specified reasons if he were to return. *See Gomez v. INS*, 947 F.2d 660, 663 (2d Cir.1991). Even if he satisfies this burden, however, the alien faces an additional hurdle of prevailing upon the Attorney General to exercise her discretion to grant asylum. *See Osorio v. INS*, 18 F.3d 1017, 1021 (2d Cir. 1994).

■ An applicant seeking withholding of deportation under 8 U.S.C. § 1253(h) must establish that his life or freedom would be threatened if he returned to his country on the basis of the same grounds set forth in the asylum law. Perhaps because withholding of deportation is mandatory once the standards are met, an applicant who seeks withholding of deportation under § 1253(h) faces a higher evidentiary burden than an asylum applicant. He must demonstrate a "clear probability" of persecution on the basis of one of the enumerated grounds. *See Sotelo–Aquije v. Slattery*, 17 F.3d 33, 38 (2d Cir.1994). Accord-

ingly, an applicant who fails to qualify for asylum *a fortiori* cannot satisfy the more stringent standards for obtaining withholding of deportation. *See Osorio*, 18 F.3d at 1032.

*Matter of Chang*

■ In *Chang*, the BIA considered the asylum application of a Chinese alien who claimed he reasonably feared persecution on the basis of his opposition to the PRC's population control measures. After discussing the goals and manner of implementation of the PRC population policy, the BIA concluded:

> "We cannot find that implementation of the 'one couple, one child' policy in and of itself, even to the extent that involuntary sterilizations may occur, is persecution or creates a well-founded fear of persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'"

*Id.* Although an alien may not invoke asylum merely by claiming that he had been or would be punished for violating the policy, the BIA recognized that the "policy could [ ] be implemented in such a way as to individuals or categories of persons so as to be persecution on account of a ground protected by the Act." Op. at p. 136. To demonstrate persecution on the basis of a protected ground, an alien must adduce "evidence that the governmental action arises for a reason other than general population control (*e.g.*, evidence of disparate, more severe treatment for those who publicly oppose the policy)." *Id.* To this end, an alien may show that "he was treated differently from other Chinese with respect to application of the 'one couple, one child' policy, or that its application in his case was in reality a guise to achieve a governmental goal other than general population control." Op. at p. 137.

Unless modified by the BIA or the Attorney General, decisions of the BIA are binding upon immigration judges. *See* 8 CFR § 3.1(g) (1994). The BIA has consistently applied *Chang* in considering applications for asylum filed by aliens who claim they fear

---

**2.** Although in his appeal to the BIA Wang challenged the IJ's decision that he is "excludable," he does not challenge that part of the decision in this petition.

persecution on the basis of their opposition to the PRC's population control policies. *See, e.g., Matter of G–,* Interim Decision No. 3215 (BIA December 8, 1993) (reaffirming reliance upon *Chang* ).

Wang's primary challenge to the IJ's reliance upon *Chang* is that the decision was overruled and rendered ineffective by three later pronouncements: (1) an interim rule promulgated by the Attorney General on January 29, 1990 ("January 1990 Interim Rule" or the "Interim Rule"); (2) Executive Order No. 12,711 issued by President Bush on April 11, 1990 ("Executive Order"); and (3) a final unpublished rule promulgated by the Attorney General in January, 1993 ("January 1993 Rule" or the "Final Rule"). In considering these arguments, I do not write on a clean slate. Similar challenges to the validity of *Chang* have been lodged by a number of other Chinese aliens and addressed by courts in this district and others. After considering Wang's arguments I conclude, like the majority of those courts, that *Chang* remains a valid precedent notwithstanding the identified pronouncements by the President and the Attorney General.

*Attorney General's Interim Rule*

On January 29, 1990, the Attorney General published an interim rule which purported to amend 8 CFR § 208.5, the then-existing regulations governing asylum applications, and directly conflicted with the holding in *Chang.* *See* 55 Fed.Reg. 30,674 (1990). The amendment provided:

"(b)(1) Aliens who have a well-founded fear that they will be required to abort a pregnancy or to be sterilized because of their country's family planning policies may be granted asylum on the ground of persecution on account of political opinion.

(2) An applicant who establishes that the applicant (or applicant's spouse) has refused to abort a pregnancy or to be sterilized in violation of a country's family planning policy, and who has a well-founded fear that he or she will be required to abort the pregnancy or to be sterilized or otherwise persecuted if the applicant were returned to such country may be granted asylum."

Although this Interim Rule was never published as a final rule and was not included in the later final published rules, Wang argues that it vitiated *Chang.* I disagree.

■ To my present knowledge, every court which has considered this argument has rejected it. *See Peng–Fei Si v. Slattery,* 864 F.Supp. 397 (S.D.N.Y.1994); *Xiu Qin Chen v. Slattery,* 862 F.Supp. 814 (E.D.N.Y. 1994); *Chen Chaun Fei v. Carroll,* 866 F.Supp. 283, 286–87 (E.D.Va.1994); *Guo Chun Di v. Carroll,* 842 F.Supp. 858, 869 (E.D.Va.1994); *Jia–Hu Gao v. Waters,* 869 F.Supp. 1474, 1480 (EFL), (N.D.Cal.1994). As Judge Cedarbaum explained in *Si:*

"[T]he 1990 Interim Regulations were not included in the final regulations which were issued on July 27, 1990 and became effective on October 1, 1990. *See* 55 Fed. Reg. 30,674 (1990). Those final regulations amended 8 C.F.R. § 208 and outlined the eligibility requirements for asylum and withholding of deportation, but did not make any reference to coercive family planning policies and made no mention of the 1990 Interim Regulations. Thus, [petitioner] cannot rely on the 1990 Interim Regulations which were effectively revoked by their omission from the final regulations issued in July of 1990."

864 F.Supp. at 401. Judge Cedarbaum's reasoning is consistent with that of the other judges who have found the Interim Rule effectively revoked by its lack of inclusion in the final rules. I find this reasoning persuasive. It seems to me clear that the failure to include the Interim Rule in the final rule effectively rescinded it. Wang has offered no authority for the contrary proposition. Accordingly, because the Interim Rule was revoked, it could not have rendered *Chang* ineffective.

*January 1990 Executive Order*

Wang's argument that Executive Order No. 12,711 superseded *Chang* is equally unavailing. By that Executive Order issued April 11, 1990, President Bush directed the Attorney General to:

"provide for enhanced consideration under the immigration laws for individuals from any country who express a fear of persecu-

138

tion upon return to their country related to that country's policy of forced abortion or coerced sterilization, as implemented by the Attorney General's regulation effective January 29, 1990."

*See* 55 Fed.Reg. 13897 (1990). As a preliminary matter, although the Order required "enhanced consideration" of applications for asylum such as the one presented here, the Executive Order does not expressly overrule the holding in *Chang.* Wang argues, however, that its reference to the January 1990 Interim Rule implies a policy directive in conflict with *Chang.*

■ Assuming *arguendo* that the substance of *Chang* conflicts with the directive of the Executive Order, the Executive Order did not have the effect of overruling that decision. Once again, the courts which have addressed this argument have uniformly rejected it. *See Si v. Slattery,* 864 F.Supp. at 402; *Chen v. Slattery,* 862 F.Supp. at 822; *Fei v. Carroll,* 866 F.Supp. at 287; *Gao v. Waters,* 869 F.Supp. at 1480. In *Chen v. Slattery,* Judge Sifton recognized the settled principle that "an Executive Order may not be enforced by a private party where no private right of action is created." 862 F.Supp. at 822 (citing *Haitian Refugee Center v. Baker,* 953 F.2d 1498, 1510–11 (11th Cir.1992), *cert. denied,* 502 U.S. 1122, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992)). Wang does not argue that the Executive Order created a private right of action or that he is otherwise entitled to enforce it. It follows that even if the Attorney General failed to comply with the Executive Order by failing to take steps to overrule *Chang,* petitioner cannot rely upon the unheeded Executive Order itself as remedying that omission without any right to enforce its mandate.[3]

*Attorney General's January 1993 Final Rule*

Wang's last argument related to the ineffectiveness of *Chang* as a precedent focuses upon the final rule promulgated by the Attor-

ney General in January of 1993 which purported to amend the regulations governing asylum and withholding of deportation[4] to provide broad application to aliens who oppose the PRC's coercive family planning policies. One of the stated intentions of the January 1993 Final Rule was to supersede the *Chang* decision

"to the extent that it held that the threat of forced abortion or involuntary sterilization pursuant to a government family planning policy does not give rise to a well-founded fear of persecution on account of political opinion, without an additional showing on the issue of the applicant's actual political opinion."

On the basis of this explanatory note it is clear that, if effective, the Final Rule overruled the decision in *Chang* and the BIA's reliance upon it was erroneous. The question is whether the Final Rule became effective given that it was never published in the Federal Register.

Then–Attorney General William P. Barr promulgated the Final Rule on January 13, 1993 in the last days of the Bush administration. The Final Rule provided that its effective date would be the date of publication. It was submitted to the Federal Register on January 22, 1993 and scheduled to be published in that publication on January 25, 1993. Before publication was effected, on January 23, 1993, the day after President Clinton's inauguration, the Acting Assistant Attorney General affirmatively withdrew the Final Rule from publication pursuant to a directive of President Clinton. *See* 58 Fed. Reg. 6074 (1993) (requesting that each agency "withdraw from the Federal Register for approval [by the newly appointed agency heads] all regulations that have not yet been published in the Federal Register. . . ."). The regulation was never re-submitted for publication.

3. The Executive Order does not give effect to the Attorney General's January 1990 Interim Rule merely because reference is made to it. The Executive Order was issued more than two months prior to promulgation of the final asylum regulations which, as discussed above, did not include the substance of the Interim Rule and

therefore effectively revoked it notwithstanding the Executive Order's mandate. *See, supra,* op. at pp. 137–138.

4. This rule amended § 208.13 which is the same but renumbered regulation which the interim regulation of January 1990 sought to amend.

Wang concedes that the Interim Rule was never published. Nonetheless, he submits that publication was not required for the Final Rule to become effective and the agency is therefore bound to follow it. A conflict exists in this circuit as to the merits of this argument. In *Xin–Chang Zhang v. Slattery*, 859 F.Supp. 708 (S.D.N.Y.1994), Judge Patterson recognized the requirement of the Freedom of Information Act ("FOIA") that substantive rules of general applicability must be published in order to become effective, but held that "where a rule confers a substantive benefit to a person, an agency must comply with it, even if the rule is not published." *Id.* at 712. Since the January 1993 Final Rule clearly conferred substantive benefits upon asylum applicants, Judge Patterson held that it became effective without publication. Subsequent to that decision, Judges Sifton and Cedarbaum have rejected the same argument, respectfully disagreeing with Judge Patterson. *See Si v. Slattery*, 864 F.Supp. at 403; *Chen v. Slattery*, 862 F.Supp. at 822–23. *See also Fei v. Carroll*, 866 F.Supp. at 287 (rejecting argument that January 1993 Rule was effective without publication); *Gao v. Waters*, 869 F.Supp. at 1480 (same).

On the surface, the cases cited by Wang and in *Zhang* appear to lay foundation to Wang's argument. In *Montilla v. INS*, 926 F.2d 162 (2d Cir.1991), the Second Circuit noted that an agency would be required to follow its established procedure even though that procedure had not attained the status of a formal regulation. In *State of New York v. Lyng*, 829 F.2d 346, 354 (2d Cir.1987), the court held that the Secretary of Agriculture's interpretation of food stamp regulations did not adversely affect any member of the public and therefore their lack of publication did not preclude the Secretary from applying them. *Nguyen v. United States*, 824 F.2d 697, 701–2 (9th Cir.1987), also involved a challenge to the reliance of the Department of Agriculture upon an unpublished instruction concerning the food stamp program. The court held that the Department's adherence to that instruction was proper because it did not adversely affect any individual's substantive rights and was therefore not required to be published under the FOIA. *See*

*also United States v. Aarons*, 310 F.2d 341, 347–48 (2d Cir.1962) (holding that although order of Coast Guard should have been published in Federal Register, defendants who knew of the order were not immune from prosecution for its violation); *Donovan v. Wollaston Alloys, Inc.*, 695 F.2d 1, 9 (1st Cir.1982) (OSHA entitled to apply regulation despite failure to publish it in Federal Register—regulation was an internal procedure and thus was exempt from publication in Federal Register); *Hogg v. United States*, 428 F.2d 274, 280 (6th Cir.1970) (taxpayer could not challenge Attorney General's regulations governing internal appellate procedures because "the Administrative Procedure Act does not require that all internal delegations of authority from the Attorney General must be published in order to be effective" and taxpayer not adversely affected by the instructions), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 805 (1971).

These cases stand in contrast to the facts presented here for several reasons. None of these cases held an agency obliged to follow its unpublished rule. In dictum the *Montilla* court expressed that possibility but actually held that the agency was required to adhere to its *published* rule. The other cited cases held that an agency was authorized to enforce its unpublished rule, something which the INS has demonstrated no proclivity to do with respect to the January 1993 rule. Moreover, in contrast to the policy set forth in the January 1993 final rule, the cited cases concerned the effectiveness of unpublished regulations or instructions which applied consistently followed agency policy. *See Lyng*, 829 F.2d at 353 (finding that the Secretary had consistently applied and regularly advised the State of New York of the challenged interpretation); *Nguyen*, 824 F.2d at 702 (noting that "the Instruction made no change in past agency practices"). *Cf. Donovan*, 695 F.2d 1 (no dispute that regulation represented the agency's policy); *Hogg*, 428 F.2d 274 (same).

█ Perhaps most importantly, none of these cases presented the situation faced here in which an unpublished rule not only *deviated* from agency policy (as consistently applied by the BIA's decision in *Chang* ) but

was actually *withdrawn* by the agency from publication. It is illogical to conclude that a newly promulgated regulation, which on its face became effective upon the date of publication, was ever followed as agency *policy* when the Attorney General expressly withdrew it from publication so as to consider whether it should be approved. Judge Cedarbaum's analysis in *Si* is instructive on this point:

> "None of the authority cited by [petitioner][5] stands for the proposition that an agency is bound to follow a rule that it has never before followed and that it in fact withdrew from publication, and thereby affirmatively decided not to adopt. The purpose of the FOIA is to ensure that all persons who may be affected by a particular regulation have notice of its provisions. The FOIA cannot be used to force an agency to adopt a new regulation."

864 F.Supp. at 404. Assuming *arguendo* that there exists authority for the proposition that an agency may be bound to follow its consistently applied but unpublished policy, I nonetheless find no authority requiring the INS to follow the Final Rule under the circumstances presented here. I accordingly conclude that the Attorney General's final unpublished rule, never having become effective, did not overrule *Chang*. In so doing, I respectfully disagree with Judge Patterson's contrary conclusion in *Zhang*.

*Propriety of Chang*

■ Having determined that *Chang* remains a valid precedent notwithstanding the identified pronouncements of the President and the Attorney General, I must consider Wang's argument that the decision itself is an improper construction of the statute. Although the BIA's conclusions of law are subject to this Court's *de novo* review, the BIA's

5. Si relied upon, *inter alia, Montilla,* 926 F.2d 162; *Donovan,* 695 F.2d 1; and *Hogg,* 428 F.2d 274.

6. For example, an applicant may demonstrate that he has a well-founded fear of persecution on the basis of his political opinion by offering "evidence of disparate, more severe treatment for those who publicly oppose the policy." *See* op. at p. 136.

interpretations of statutory law are accorded "substantial deference." *Osorio,* 18 F.3d at 1022. Under this standard, the BIA's statutory interpretation will not be reversed unless the statute or its legislative history demonstrates "that the interpretation is contrary to Congress's intent." *Id.* (citing *Chevron U.S.A. Inc. v. Natural Resource Defense Council, Inc.,* 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984)). If Congress has not addressed the precise question at issue, the agency's reasonable construction of a statutory provision controls. *See Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782.

■ Wang's principal contention is that *Chang* precludes individual consideration of each alien's asylum application in violation of the statute. His concern is misguided. *Chang* does not prohibit case-by-case determinations of asylum claims based on implementation of the PRC population control policy. To the contrary, by its explicit language *Chang* allows individual applicants to qualify for asylum by demonstrating persecution on the basis of one of the statutory grounds. Indeed, the opinion attempts to set forth guidelines concerning the sort of evidence which an applicant might offer in order to satisfy the standard.[6] Moreover, although the IJ and the BIA applied *Chang* as the governing precedent they nevertheless considered the evidence offered by Wang and determined that Wang had simply not demonstrated that the policy was (or that Wang feared it would be) implemented in such a way as to punish him or his wife on the basis of his religion, political opinion or any other protected factor. Accordingly, contrary to Wang's contention, *Chang* does not preclude individualized determinations of asylum applications in contravention of the asylum provisions. Nor was Wang's application in fact denied individual consideration.[7]

7. Wang argues that because the PRC considers violators of its policy "class enemies," and imputes political opinion to them they are "subjected to disproportionately severe punishment and extra-legal repercussions." Petitioner's Memorandum in Support of Motion for Preliminary Injunction at pp. 27–28. Even under *Chang,* however, Wang was permitted to provide evidence that the PRC considered his violation of the policy the assertion of a political belief and that the threat to sterilize him was motivated by

To the extent that Wang challenges *Chang*'s holding that indiscriminate implementation of the population control policy is not persecution *per se* as an unreasonable interpretation of the statute, his argument fails. Because the statute neither explicitly nor implicitly addresses whether opposition to population control policies can form the basis of asylum eligibility, Congress has not spoken on the issue and it therefore is left to this Court to determine only whether the BIA's interpretation of the statute is reasonable.

In *I.N.S. v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), the Supreme Court reviewed the BIA's denial of the asylum application of a Guatemalan native who claimed he feared persecution from a guerilla organization who would attempt to forcibly conscript him into its military forces if he returned to Guatemala. Since the asylum statute is concerned with "the *victim's* political opinion, not the persecutor's," *id.* at 482, 112 S.Ct. at 816, the Court held that Elias–Zacarias could not demonstrate eligibility for asylum by arguing that the guerilla organization sought to conscript him in order to further their political beliefs. The Court noted that Elias–Zacarias' desire not to be conscripted was not inherently political, even though the guerrillas harbored a political agenda, given that he could have resisted conscription for a number of non-political reasons. *Id.* at 480–83, 112 S.Ct. at 815–816. Moreover, "since the statute makes motive critical," the Court held that in order to qualify for asylum an applicant "must provide *some* evidence of [his persecutors' objective], direct or circumstantial" to persecute him on account of his political opinion. *Id.* at 483, 112 S.Ct. at 817. Because Elias–Zacarias had not presented evidence of his political beliefs or his persecutor's improper motives,

his asylum application was held properly denied.

The BIA's conclusion in *Chang* that to qualify for asylum an applicant must offer some evidence that the population policy was implemented against him as the result of his political beliefs (or another protected ground) is consistent with *Elias–Zacarias'* conclusion that the asylum provisions focus upon the motive of the persecutor and the belief of the victim. After carefully considering the history of the policy, *Chang* recognized that the PRC population policy has an objectively legitimate and non-political goal of containing the expanding rate of population growth. Given that its goal is to discourage births and not to punish political opposition, the Board held that an applicant must demonstrate that the policy was implemented against him was for a reason other than general population control. In view of the statute's concern with the persecutor's motive, also recognized in *Elias–Zacarias, Chang*'s requirement that an applicant demonstrate that the population policy was implemented against him not merely to control population growth but to punish his political opinion (or another protected characteristic), is an entirely reasonable construction of the statute. The same must be said for the Board's implicit holding that opposition to the policy manifested by a desire to have more children fails to constitute an inherently political belief. The statute focuses upon the victim's political belief and nothing therein precludes the Board's narrow definition of political opinion on this score.[8] Because I conclude that the BIA's decision in *Chang* is a reasonable construction of the statutory provisions, I reject Wang's contention that it must be reversed as erroneous.

Wang cites *Guo Chun Di v. Carroll*, 842 F.Supp. 858 to support his contention that *Chang* is not entitled to deference. In *Di*,

---

a desire to punish that belief. Because he did not offer evidence before the IJ that he was punished as a political enemy or was subjected to disproportionate punishment, I cannot find that the IJ or the BIA erred in denying his claim.

8. Although Judge Ellis in *Guo Chun Di v. Carroll*, 842 F.Supp. at 872, opined that "there can be little doubt that the phrase 'political opinion' encompasses an individual's views regarding

procreation," he did so only after determining that *Chang* warranted no deference. As I have come to the opposite conclusion, it is not for me to determine *de novo* whether the desire to have more children manifested by the act of procreation constitutes a political opinion. Rather, I must, as I have stated, determine whether that implicit holding in *Chang* is a permissible interpretation of the statute.

the court held that the numerous inconsistent administrative pronouncements concerning the asylum eligibility of aliens who fear implementation of restrictive population control measures amounted to "an administrative cacophony undeserving of judicial deference." *Id.* at 867. While it is readily apparent that various arms of the agency have from time to time made inconsistent pronouncements concerning the policy to be followed, the only consistent policy which has in fact been applied is the *Chang* decision, and Wang does not argue otherwise. Under these circumstances, the deference afforded the BIA's decision is proper. *See Jia–Ging Dong v. Slattery,* 870 F.Supp. 53, 58 (S.D.N.Y.1994) (Mukasey, J.), and cases cited therein; *see also Himes v. Shalala,* 999 F.2d 684, 690 (2d Cir.1993) ("an inconsistent position alone is not enough to require this Court to give less deference to" an agency's statutory interpretation).

*Motion to Reopen Proceedings*

Lastly, Wang argues that the BIA improperly refused to reopen the exclusion proceedings on the basis of the two ground advanced by Wang for such relief: (1) the decision in *Di, supra,* in which the court held that *Chang* was not entitled to deference and was an erroneous decision; and (2) a December 7, 1993 Order ("December 1993 Order") issued by Attorney General Janet Reno rescinding her certification for review of two BIA decisions which relying upon *Chang* held the applicants ineligible for asylum. As noted, *supra,* op. at p. 136 n. 1, the BIA's refusal to reopen exclusion proceedings pursuant to 8 C.F.R. § 3.2 (1987) may be overturned only if the Board abused its discretion in so doing. *See Doherty,* 502 U.S. at 323–24, 112 S.Ct. at 725.

The BIA's failure to reopen the proceedings in this case cannot be considered an abuse of its discretion. The BIA correctly noted that because it is not "bound to follow the published cases of a federal district court in cases arising within the same district," op. at 135, the *Di* decision which reversed *Chang* did not compel the reopening of proceedings. Wang does not offer any authority to the contrary. In addition, as the government notes, the Eastern District of Virginia itself

is split as to the validity of *Chang*. *Compare Fei v. Carroll,* 866 F.Supp. at 286 (holding that *Chang* is a reasonable interpretation of the asylum laws). Accordingly, given that it was not required to follow *Di*, the BIA properly denied the motion on that basis.

Wang's second ground for reopening is equally unpersuasive. The Attorney General had previously accepted two cases for review upon the BIA's request that she resolve the conflict between *Chang* and the Executive Order. In her December 1993 Order, Attorney General Reno simply rescinded the order granting review noting that "[a]fter review, it is apparent that the BIA's decisions in these cases do not require a determination that one or the other of these standards is lawful and binding." R at 17. Wang argues that because the December 1993 Order recognized a conflict between *Chang* and Executive Order No. 12,711, the Executive Order must govern because it came later. *See* Petitioner's Reply Memorandum of Law at p. 6. His argument is ill-founded. The December 1993 Order merely rescinded the Attorney General's previous order accepting the cases for review while noting that the BIA had requested that she "resolve the conflict" between *Chang* and the Executive Order. It did not undertake to resolve any conflict, nor did it impugn the validity of *Chang*. As such, the BIA properly declined to reopen the proceedings based upon the December 1993 Order.

## CONCLUSION

In the light of the above discussion, I conclude that because *Chang* has not been overruled and was not an improper construction of the asylum provisions, the IJ and the BIA permissibly relied upon it as valid precedent. The BIA properly affirmed the IJ's decision rejecting Wang's asylum application because he had not demonstrated eligibility for asylum based on his wife's forced abortion or his fear that if he returned to China he would be forcibly sterilized.

This decision may appear cruel. But the courts' powers are constrained in immigration matters. They may be contrasted in that regard with the Attorney General, who has the power to promulgate consistent and

coherent guidelines in this and other areas of immigration law.

The Clerk of the Court is directed to dismiss the petition.