48 F.3d 1331
 63 USLW 2562
 CHEN ZHOU CHAI, Plaintiff-Appellant,
v.
William J. CARROLL, in his official capacity as District
Director, Washington District, United States Immigration and
Naturalization Service; Mary M. Dunne, Acting Chairman of
the Board of Immigration Appeals; Anthony Moscato,
Director, Executive Office for Immigration Review,
Defendants-Appellees.
 No. 94-1694.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 2, 1994.
Decided March 6, 1995.
 
 ARGUED: Michael Peter Socarras, Sr., Covington & Burling, Washington, DC, for appellant. Lauri Steven Filppu, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellees. ON BRIEF: Nicholas W. Fels, Jeffrey B. Coopersmith, Christopher A. Donesa, Covington & Burling, Washington, DC, for appellant. Frank W. Hunger, Asst. Atty. Gen., David M. McConnell, Kristin A. Cabral, Office of Immigration Litigation, Civ. Div., U.S. Dept. of Justice, Washington, DC, for appellees.
 Before RUSSELL and WIDENER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 Affirmed by published opinion. Judge RUSSELL wrote the opinion, in which Judge WIDENER and Senior Judge CHAPMAN joined.
 OPINION
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 In this immigration case, the Board of Immigration Appeals (the "Board") denied appellant Chen Zhou Chai's application for asylum in the United States. Chen sought judicial review of the Board's decision by filing a petition for a writ of habeas corpus. Chen appeals the district court's denial of the petition. We affirm.
 
 I.
 
 2
 Chen Zhou Chai ("Chen"), a citizen of the People's Republic of China ("PRC"), is one of approximately 300 illegal Chinese immigrants who jumped off the M/V Golden Venture when it ran aground on a sand bar in New York harbor about 100 yards from shore. Chen boarded the Golden Venture on February 14, 1993 in Fouzhou, a city in the Fujian Province, PRC. On June 6, 1993, the Golden Venture ran aground in New York harbor, within the maritime boundaries of the United States. Chen jumped into the water and started to swim to shore, but a rescue boat picked him up before he reached the shore.[1]
 
 
 3
 On shore, the Immigration and Naturalization Service ("INS") placed Chen in detention. The INS initiated exclusion proceedings against Chen under 8 U.S.C. Sec. 1182(a)(7). Chen applied for political asylum under 8 U.S.C. Sec. 1158 and for withholding of deportation under 8 U.S.C. Sec. 1253(h).
 
 
 4
 An immigration judge held an evidentiary hearing on July 22, 1993. Chen testified that he lived in Kung Shiao commune in Tin Tiang village, Fujian province, with his wife and two children, a daughter born in 1977 and a son born in 1981. Although the birth of their second child violated the PRC's "one couple, one child" policy, the government imposed no sanctions on Chen or his family at that time.
 
 
 5
 Chen worked as a clerk at a government-owned food cooperative on a commune. Chen testified that he had received two notices informing him that he must attend commune meetings. Chen did not attend the commune meetings and informed Jian Guo Dong, the head of the commune, that he did not want to attend. Jian fined Chen five yuan for not attending these meetings, but Chen refused to pay the fine.[2] Chen testified that the commune director once asked him to join the Communist party but that he declined.
 
 
 6
 In January 1992, the government arrested Chen's wife, who was five months pregnant with the couple's third child, and forced her to have an abortion. In March 1992, the Chinese government, through the cooperative, imposed a 20,000 yuan fine on Chen for having a second child. The amount was approximately twelve times Chen's annual salary. Chen advised Jian that he did not have the money to pay the fine.
 
 
 7
 In July 1992, the government sent Chen a notice to report to a local hospital for surgical sterilization. Jian threatened that Chen's family would not be able to eat if Chen did not undergo the procedure. Concerned that he would lose his job, Chen underwent the sterilization.
 
 
 8
 In October 1992, Jian notified Chen that he would have to pay the 20,000 yuan fine over five years or his wife would be sterilized. Furthermore, Chen was not allowed to work after October 1992 because he did not attend commune meetings and did not cooperate with the commune.
 
 
 9
 Chen made arrangements to leave China. Chen's cousin arranged passage for Chen to come to the United States and borrowed $9,000 to help pay the $25,000 cost of the trip. Chen sailed to the United States on the M/V Golden Venture, jumped off the ship when it ran aground, and was picked up by a rescue boat before he reached the shore.
 
 
 10
 After hearing Chen's testimony, the immigration judge issued a decision on August 31, 1993 denying asylum and withholding of deportation. The immigration judge found that Chen's "effort to portray himself as a political dissident who suffered sterilization in retaliation for his political non-conformity was not plausible." Administrative Record 54. The judge instead found that all the actions that the Chinese government took against Chen stemmed from his failure to comply with the PRC's birth control policy. The immigration judge accepted as credible Chen's testimony regarding his refusal to comply with the birth control policy and the sanctions applied by the government for his noncompliance.
 
 
 11
 The immigration judge, however, denied Chen's asylum claim under the precedent of Matter of Chang, Int.Dec. 3107 (BIA1989). In Matter of Chang, the Board interpreted the asylum statute to require an alien seeking asylum based upon coercive population control practices of the PRC to produce evidence that the feared governmental action actually arises not for reasons of population control, but specifically because of the alien's political opinions (or another reason protected by the Act). Because the immigration judge found that the PRC's actions against Chen, including the forced sterilization, resulted from Chen's noncompliance with the PRC's birth control policy and not from any political dissidence, the immigration judge denied Chen's claim for asylum. The immigration judge also found that exclusion proceedings were proper because Chen never made an entry into the United States.
 
 
 12
 On appeals to the Board and thereafter to the Eastern District of Virginia, Chen argued that Matter of Chang, in light of subsequent administrative actions, no longer controlled the administrative policy toward asylum petitions based on persecution for failure to comply with the PRC's coercive birth control policy. The Board, finding that Matter of Chang was still the controlling administrative precedent, affirmed the decision of the immigration judge on January 3, 1994. The district court also applied Matter of Chang and denied Chen's petition for a writ of habeas corpus on May 4, 1994. Chen v. Carroll, 858 F.Supp. 569 (E.D.Va.1994). We affirm the decision of the district court.
 
 II.
 
 13
 The Immigration and Nationality Act (the "INA") provides that an alien "may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. Sec. 1158(a). Section 1101(a)(42)(A) defines the term "refugee" as:
 
 
 14
 any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....
 
 
 15
 8 U.S.C. Sec. 1101(a)(42)(A) (emphasis added).
 
 
 16
 In Matter of Chang, Interim Decision 3107, at 10-11 (BIA1989), the Board of Immigration Appeals held that implementation of the PRC's population control policy, even to the extent that involuntary sterilizations may occur, does not in itself constitute persecution or create a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. If the PRC took action or threatened to take action against the asylum applicant merely to enforce its population control policy, the asylum claim must fail. Id. at 11. In order to establish asylum eligibility, the applicant must demonstrate that the PRC selectively enforced its population control policy against the applicant because of his or her race, religion, nationality, membership in a particular social group, or political opinion. Id. Thus, the Board held that an asylum applicant cannot claim that his failure to comply with population control policy expressed a political opinion against the policy, and that any sanctions taken by the PRC to enforce the policy amounted to persecution for that political opinion. See id. Under the Board's ruling in Matter of Chang, the asylum applicant must demonstrate that any action taken by the PRC against him "arises for a reason other than general population control." Id.
 
 
 17
 Soon after the Board issued its opinion in Matter of Chang, Congress began considering legislation to overturn it. Senators William L. Armstrong and Dennis DeConcini offered an amendment to the Emergency Chinese Immigration Relief Act of 1989 (the "1989 Act"), H.R. 2712, a bill introduced in response to the events in Tiananmen Square in June of 1989. The Armstrong-DeConcini amendment would have provided for "careful consideration" of any asylum applicant who expresses a fear of persecution upon returning to the PRC relating to the PRC's population control policy. Emergency Chinese Immigration Relief Act of 1989, Sec. 3(a), H.R. 2712, 101st Cong., 1st Sess. (1989).[3] The Senate passed the amendment unanimously, 135 Cong.Rec. S8241-55 (Daily Ed. July 19-20, 1989), and the House of Representatives voted 300-115 to concur in the Senate amendment, 135 Cong.Rec. H7945-54 (Daily Ed. Nov. 2, 1989).
 
 
 18
 Although he agreed with the substance of the legislation, President George Bush vetoed the 1989 Act because he viewed it as an intrusion into his constitutional and statutory authority. Memorandum of Disapproval for the Emergency Chinese Immigration Relief Act of 1989, reprinted in Public Papers of the Presidents of the United States 1611-12 (Nov. 30, 1989). Instead, President Bush initiated administrative steps to provide Chinese nationals opposing the PRC's family planning policy with the protections envisioned in the Armstrong-DeConcini amendment. Meanwhile, Congress attempted to override President Bush's veto of the 1989 Act. Although the House voted 390-25 to override the veto, 136 Cong.Rec. H66-67 (Daily Ed. Jan. 24, 1990), the Senate failed to override by a vote of 62-37, falling five votes short of the required two-thirds majority, 136 Cong.Rec. S382 (Daily Ed. Jan. 25, 1990).
 
 
 19
 In response to President Bush's instructions, Attorney General Richard Thornburgh promulgated an interim rule on January 29, 1990, which amended the existing regulations governing asylum and withholding of deportation. Specifically, the January 29, 1990 interim rule added a new subsection to the burden of proof regulation (then codified at 8 C.F.R. Sec. 208.5) to provide, in part, that:
 
 
 20
 (1) Aliens who have a well-founded fear that they will be required to abort a pregnancy or to be sterilized because of their country's family planning policies may be granted asylum on the ground of persecution on account of political opinion.
 
 
 21
 (2) An applicant who establishes that the applicant (or applicant's spouse) has refused to abort a pregnancy or to be sterilized in violation of a country's family planning policy, and who has a well-founded fear that he or she will be required to abort the pregnancy or to be sterilized or otherwise persecuted if the applicant were returned to such country may be granted asylum.
 
 
 22
 55 Fed.Reg. 2803, 2805 (Jan. 29, 1990). On April 11, 1990, President Bush underscored the substance of the interim rule by issuing Executive Order 12,711. Section 4 of the Executive Order provided that:
 
 
 23
 The Secretary of State and the Attorney General are directed to provide for enhanced consideration under the immigration laws for individuals from any country who express a fear of persecution upon return to their country related to that country's policy of forced abortion or coerced sterilization, as implemented by the Attorney General's regulation effective January 29, 1990.
 
 
 24
 Executive Order 12,711, Sec. 4, 55 Fed.Reg. 13897 (Apr. 11, 1990).
 
 
 25
 On July 27, 1990, however, Attorney General Thornburgh published a final rule establishing procedures to be used in determining asylum under 8 U.S.C. Sec. 1158 and withholding of deportation under 8 U.S.C. Sec. 1253(h). 55 Fed.Reg. 30674 (July 27, 1990). The July 27, 1990 rule represented a comprehensive revision of the regulations pertaining to asylum and withholding claims. However, the new burden of proof regulation did not provide for asylum based on an applicant's opposition to a country's family planning policy. See 8 C.F.R. Sec. 208.13 (1994); 55 Fed.Reg. 30674, 30683 (July 27, 1990). The language of the January 29, 1990 interim rule did not appear in the annual codification and appears not to have survived the comprehensive revision of the asylum and withholding regulations. See Guo v. Carroll, 842 F.Supp. 858, 869 (E.D.Va.1994) ("it appears that the January 1990 Interim Rule did not survive beyond July 1990, when the Attorney General issued a comprehensive revision of the asylum regulations"), appeal docketed, No. 94-1416 (4th Cir. Mar. 31, 1994).[4]
 
 
 26
 On January 22, 1993, the last day of the Bush Administration, Attorney General William Barr signed a final rule that provided for asylum based upon an applicant's opposition to a country's family planning policy. The language of the January 22, 1993 rule essentially reiterated the January 29, 1990 interim rule.[5] The language of the January 22, 1993 rule provided that it would take effect upon publication in the Federal Register, which was scheduled for January 25, 1993.
 
 
 27
 The January 22, 1993 rule, however, was never published. Following his inauguration on January 22, 1993, President William Clinton directed Leon Panetta, the newly-appointed Director of the Office of Management and Budget, to issue a memorandum to the heads of all federal government agencies. That memorandum requested that each agency withdraw from publication all regulations that had not yet been published in the Federal Register so that President Clinton's appointees could review and approve the new regulations. 58 Fed.Reg. 6074 (1993). Pursuant to this memorandum, the Acting Assistant Attorney General issued a memorandum directing the Office of the Federal Register to withdraw from publication a number of regulations, including the January 22, 1993 rule. To date, the Clinton Administration has not resubmitted the January 22, 1993 rule for publication.
 
 
 28
 On June 7, 1993, the Board referred two of its decisions to Attorney General Janet Reno for her review pursuant to 8 C.F.R. Sec. 3.1(h)(1).[6] In these two decisions, the Board applied Matter of Chang as controlling precedent. Recognizing that Executive Order 12,711 set forth asylum standards in conflict with Matter of Chang, the Board certified the cases for the Attorney General's review to give her an opportunity to resolve the conflict. Although the Attorney General granted the Board's request for review on June 29, 1993, she rescinded her grant of review on December 7, 1993, thereby leaving the conflict unresolved. The Board, in light of the Attorney General's silence, has continued to apply Matter of Chang as controlling precedent, as it did when it reviewed Chen's asylum petition.
 
 III.
 
 29
 We review de novo the district court's denial of Chen's petition for a writ of habeas corpus. De Brown v. Department of Justice, 18 F.3d 774, 775 (9th Cir.1994); Sotelo-Aquije v. Slattery, 17 F.3d 33, 35 (2d Cir.1994). Thus, we review de novo the Board's conclusion that Chen failed to demonstrate his eligibility for asylum. Sotelo-Aquije, 17 F.3d at 35. Nonetheless, we may not reverse the Board's factual findings unless the evidence not only supports a contrary conclusion, but compels it. INS v. Elias-Zacarias, 502 U.S. 478, 480 & n. 1, 112 S.Ct. 812, 815 & n. 1, 117 L.Ed.2d 38 (1992); Huaman-Cornelio v. Board of Immigration Appeals, 979 F.2d 995, 999 (4th Cir.1992).
 
 A.
 
 30
 Chen argues that the Board erred in applying Matter of Chang to his claim for asylum and should have granted him asylum under Executive Order 12,711. Because we conclude that Executive Order 12,711 did not create a right enforceable by a private cause of action, we reject this argument.
 
 
 31
 As a general rule, "there is no private right of action to enforce obligations imposed on executive branch officials by executive orders." Facchiano Constr. Co. v. United States Dep't of Labor, 987 F.2d 206, 210 (3d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 80, 126 L.Ed.2d 48 (1993). An executive order is privately enforceable only if it is issued pursuant to a statutory mandate or delegation of congressional authority. In re Surface Mining Regulation Litig., 627 F.2d 1346, 1357 (D.C.Cir.1980); Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 234 (8th Cir.1975), cert. denied, 426 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); see also United States Dep't of Health & Human Servs. v. Federal Labor Relations Auth., 844 F.2d 1087, 1095-96 (4th Cir.1987) (en banc ) ("The executive branch ... simply has no power to make the law; that power rests exclusively with Congress.") (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587-88, 72 S.Ct. 863, 866-67, 96 L.Ed. 1153 (1952)).
 
 
 32
 The source of authority for Executive Order 12,711 was the President's general constitutional powers to direct the exercise of powers statutorily delegated to executive branch officials. See Myers v. United States, 272 U.S. 52, 135, 47 S.Ct. 21, 31, 71 L.Ed. 160 (1926) ("The ordinary duties of officers prescribed by statute come under the general administrative control of the President by virtue of the general grant to him of the executive power, and he may properly supervise and guide their construction of the statutes under which they act."). The INA expressly gives the Attorney General the discretion to determine whether an alien is a refugee within the meaning of 8 U.S.C. Sec. 1101(a)(42)(A). 8 U.S.C. Sec. 1158(a). Because Congress did not specifically delegate this authority to the President, we cannot conclude that Executive Order 12,711 has a specific foundation in congressional action.[7]
 
 
 33
 Chen argues that Executive Order 12,711 should have the force and effect of law because Congress's passage of the Armstrong-DeConcini Amendment and the 1989 Act, although not signed into law, demonstrated that Congress ratified the actions in section 4 of the Executive Order. We reject this specious argument. Congress passed the Armstrong-DeConcini Amendment to the 1989 Act, which would have conferred refugee status on aliens who suffered persecution due to their opposition of the PRC's coercive population control policy, but failed to obtain President Bush's approval and to override his veto. Because President Bush viewed the 1989 Act as impinging on his constitutional and statutory authority, he vetoed the Act and promised to accomplish the same goals through administrative means. Chen now urges this Court to enforce section 4 of Executive Order 12,711 as if it had the force and effect of law. However, President Bush vetoed the 1989 Act (including the Armstrong-DeConcini Amendment) specifically because he did not want it to have statutory force.
 
 
 34
 Furthermore, an executive order is privately enforceable only if it was intended to create a private cause of action. Independent Meat Packers, 526 F.2d at 236. Executive Order 12,711, however, was not intended to create a private cause of action. The plain language of the Executive Order indicates that it was an internal directive from the President to his Attorney General, instructing him to exercise his statutory authority to provide for enhanced consideration of certain asylum claims. 55 Fed.Reg. 13897 (Apr. 11, 1990). A court should not enforce an executive order intended for the internal management of the President's cabinet. See United States Dep't of Health, 844 F.2d at 1095 ("[I]t has long been held that the executive branch may promulgate [internal management directives] without creating rights and obligations enforceable by third parties."); Independent Meat Packers, 526 F.2d at 236 (holding that executive order "was intended primarily as a managerial tool for implementing the President's personal economic policies and not as a legal framework enforceable by private civil action.").
 
 
 35
 The Attorney General, by omitting the language of the January 29, 1990 interim rule from the July 27, 1990 final rule, failed to heed President Bush's directive to provide for enhanced consideration for asylum claims based on persecution or the fear of persecution resulting from an applicant's opposition to the PRC's family planning policy. The President had the responsibility to ensure that the Attorney General complied with his directive. The President, either out of neglect or a change in policy, failed to enforce his Executive Order. It is not the role of this Court to force managerial discipline on the President's cabinet.
 
 
 36
 We conclude that Executive Order 12,711 does not give Chen a privately enforceable right to asylum. Chen has a right to asylum only to the extent permitted by the Attorney General's regulations. Despite the Executive Order, those regulations as of July 27, 1990 have not provided for asylum to applicants based on persecution or a fear of persecution resulting from opposition to the PRC's family planning policy. We conclude that the existence of Executive Order 12,711 does not prevent the Board of Immigration Appeals from applying Matter of Chang as controlling precedent. See also Wang v. Slattery, 877 F.Supp. 133, 138 (S.D.N.Y.1995) (Executive Order 12,711 did not overrule Matter of Chang ); Lan v. Waters, 869 F.Supp. 1483, 1489 (N.D.Cal.1994) (same); Gao v. Waters, 869 F.Supp. 1474, 1480 (N.D.Cal.1994) (same); Chen v. Carroll, 866 F.Supp. 283, 287 (E.D.Va.1994) (same); Si v. Slattery, 864 F.Supp. 397, 401-02 (S.D.N.Y.1994) (same); Chen v. Slattery, 862 F.Supp. 814, 822 (S.D.N.Y.1994) (same). But see Guo, 842 F.Supp. at 865-70 (refusing to defer to the Board's decision in Matter of Chang ).
 
 B.
 
 37
 Chen also argues that the Board erred in rejecting his claim for asylum because it failed to follow the January 29, 1990 interim rule, which provides asylum to applicants who fear persecution because of their opposition to their country's family planning policy. Because we conclude that the January 29, 1990 interim rule was superseded by the July 27, 1990 final rule, we reject this argument.
 
 
 38
 If the January 29, 1990 interim rule were still a valid regulation, the Board would certainly have had to follow it. See Electronic Components Corp. of N.C. v. NLRB, 546 F.2d 1088, 1090 (4th Cir.1976) ("It is well settled that the rules and regulations of an administrative agency are binding upon it as well as upon the citizen even when the administrative action under review is discretionary in nature."); United States v. Heffner, 420 F.2d 809, 811 (4th Cir.1970) ("An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down."). The January 29, 1990 interim rule, however, is no longer a valid regulation. On July 27, 1990, the Attorney General issued a comprehensive revision of the regulations governing asylum and withholding claims. 55 Fed.Reg. 30674 (July 27, 1990). The new burden-of-proof regulation did not provide for asylum based on the applicant's well-founded fear that the applicant will be required to abort a pregnancy or undergo sterilization, as the January 29, 1990 interim rule had provided. See 8 C.F.R. Sec. 208.13; 55 Fed.Reg. at 30683. Furthermore, the substance of the January 29, 1990 interim regulation did not appear in the annual codification of rules in 1991, nor any year since. Thus, Chen cannot rely on the January 29, 1990 interim rule, which was effectively revoked by its omission from the July 27, 1990 final rule. See also Wang, 877 F.Supp. at 137-38; Chen, 866 F.Supp. at 286-87; Si, 864 F.Supp. at 401; Chen, 862 F.Supp. at 822; Guo, 842 F.Supp. at 869.
 
 
 39
 Chen argues that the revocation of the January 29, 1990 interim rule violated the Administrative Procedure Act ("APA"), 5 U.S.C. Secs. 551 et seq. The APA requires an agency issuing a proposed rule to afford notice of the proposed rule and an opportunity for public comment. 5 U.S.C. Sec. 553. Although the Attorney General issued the July 27, 1990 final rule after a full notice and comment process, there was no notice or consideration of the revocation of the January 29, 1990 interim rule.
 
 
 40
 The notice and comment requirement of the APA does not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. Sec. 553(b). The notice and comment requirement applies only to substantive, or legislative, rules, which are rules issued by agencies pursuant to statutory authority and which implement the statute; such rules create new rights and have the force and effect of law. American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C.Cir.1993) (citing Attorney General's Manual on the Administrative Procedure Act (1947)); Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n, 874 F.2d 205, 207 (4th Cir.1989); American Hosp. Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C.Cir.1987). In contrast, interpretive rules simply state what the administrative agency thinks a statute means, and only remind affected parties of existing duties. Jerri's Ceramic Arts, 874 F.2d at 207; American Hosp. Ass'n, 834 F.2d at 1045; Guardian Fed. Savs. & Loan Ass'n v. Federal Savs. & Loan Ins. Corp., 589 F.2d 658, 664 (D.C.Cir.1978) ("[A]n interpretive rule is merely a clarification or explanation of an existing statute or rule."). Furthermore, the exemption for general policy statements allows agencies to announce their tentative intentions for the future without binding themselves. American Hosp. Ass'n, 834 F.2d at 1046.
 
 
 41
 We conclude that the January 29, 1990 interim rule was a general statement of policy and therefore exempt from the notice and comment requirement of the APA.[8] A rule is a general statement of policy if it does not establish a binding norm and leaves agency officials free to exercise their discretion. American Hosp. Ass'n, 834 F.2d at 1046; Mada-Luna v. Fitzpatrick, 813 F.2d 1006, 1015 (9th Cir.1987). The January 29, 1990 interim rule did not create a binding norm but merely provided that the Attorney General may grant asylum to aliens who have a well-founded fear that they will be forced to abort a pregnancy or to undergo sterilization. 55 Fed.Reg. at 2805. Administrative authorities retained the discretion to deny asylum to aliens who established eligibility under the interim rule. Because the January 29, 1990 interim rule was a general statement of policy, we conclude that the Attorney General could revoke the rule without completing the notice and comment requirement of the APA.[9]
 
 
 42
 We also reject Chen's argument that the January 29, 1990 interim rule was invalidly revoked because the Attorney General offered no "reasoned explanation" for the change in policy. Chen relies on Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), in which the Supreme Court held that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." However, this requirement applies only to revocations of substantive rules, not to revocations of interpretive rules or general statements of policy. Because the January 29, 1990 interim rule was a general statement of policy, we conclude that the holding of State Farm does not apply to the present case. Cf. Chen, 866 F.Supp. at 286 (holding that the State Farm holding applies only to "settled" rules and that the January 29, 1990 interim rule was not a settled rule when it was revoked).
 
 
 43
 We conclude that the January 29, 1990 interim rule is unenforceable because it was revoked by the July 27, 1990 final rule.[10] Thus, the January 29, 1990 interim rule did not prevent the Board from applying Matter of Chang as controlling precedent.
 
 C.
 
 44
 We now turn to the Board's denial of Chen's petition for asylum under its precedent in Matter of Chang. Although we conduct a plenary review of the Board's decision, we give deference to the Board's interpretations of the INA, including the asylum provision of 8 U.S.C. Sec. 1158(a) and the definition of "refugee" in 8 U.S.C. Sec. 1101(a)(42)(A). Nwolise v. INS, 4 F.3d 306, 309 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 888, 127 L.Ed.2d 82 (1994); see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc. 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984) (holding that a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the agency designed to administer the statute); Chiravacharadhikul v. INS, 645 F.2d 248, 251 (4th Cir.) (Where "the BIA's interpretation of the statutory section is neither inconsistent or unjustified, we [will] uphold the Board's construction which, in its estimation, will better serve the legislative intent and purpose."), cert. denied, 454 U.S. 893, 102 S.Ct. 389, 70 L.Ed.2d 207 (1981).
 
 
 45
 The Board has consistently applied Matter of Chang to claims for asylum based on the PRC's coercive population control practices. Although Congress tried to overrule Matter of Chang by statute, and several former Attorney Generals by regulation, these attempts have all failed. Thus, we conclude that the Board's interpretation of the asylum statute in Matter of Chang is entitled to deference. See Si, 864 F.Supp. at 405. But see Guo, 842 F.Supp. at 865-70 (refusing to defer to the Board's decision in Matter of Chang because there has been a "cacophony of administrative voices" on the issue).
 
 
 46
 The Board's interpretation in Matter of Chang of the statute governing asylum is not unreasonable and is consistent with the Supreme Court's decision in INS v. Elias-Zacarias, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). In Elias-Zacarias, the Supreme Court held that a guerrilla organization's attempt to coerce a person into performing military services does not necessarily constitute persecution on account of political opinion under 8 U.S.C. Sec. 1101(a)(42)(A). Id. at 482-85, 112 S.Ct. at 816-17. Even if Elias-Zacarias could have demonstrated that he refused to join because of his political opposition to the guerrillas' cause,[11] he also had to show that he had a well-founded fear that the guerrillas would have persecuted him "because of that political opinion, rather than because of his refusal to fight with them." Id.
 
 
 47
 In Matter of Chang, the Board similarly held that severe government sanctions for an asylum applicant's violations of its population control policy does not necessarily constitute persecution on account of political opinion. Even if the applicant can characterize his failure to comply with the population control policy as a political opinion, the applicant must still demonstrate that the government's actions or threats against the applicant, even to the extent those actions or threats involve forced abortions or sterilizations, were taken for a reason other than to enforce the population control policy. We cannot conclude that the Board's decision in Matter of Chang is an unreasonable interpretation of the statutes governing asylum. See Si, 864 F.Supp. at 405.
 
 
 48
 Chen did not demonstrate that the PRC persecuted him on account of political opinion. The evidence shows only that Chen violated the PRC's "one couple, one child" policy and that the government took actions in response to his violations. No one can question the severity of the sanctions, which included forcing his wife to abort her third pregnancy and requiring him to undergo sterilization, but Chen did not demonstrate that the government took any actions against him for a reason other than his failure to comply with the population control policy. Although Chen, in his testimony before the immigration judge, implied that the PRC took severe actions against Chen and his wife because of his refusal to join the Communist party, the immigration judge did not find his claims credible. Under Matter of Chang, the Board correctly found that Chen did not demonstrate that he suffered persecution or had a well-grounded fear of persecution on account of political opinion.
 
 
 49
 We uphold the Board's denial of asylum to Chen and affirm the district court's denial of Chen's petition for habeas corpus.
 
 IV.
 
 50
 Finally, Chen claims that he effected an entry into the United States and argues for this reason that it was inappropriate for the INS to bring exclusion proceedings against him. He claims that the INS should have brought deportation proceedings.
 
 
 51
 The INA defines an "entry" as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise...." 8 U.S.C. Sec. 1101(a)(13). An alien is required to be detained at the border pending formal disposition of his request for admission. Kaplan v. Tod, 267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585 (1925); see also 8 U.S.C. Sec. 1225(a) (requiring for admission to the United States that an alien be stopped at the entering port for an inspection and a determination of admission). There is no formal entry into the United States until the alien has been freed from this official restraint. Lazarescu v. United States, 199 F.2d 898, 900 (4th Cir.1952).
 
 
 52
 Chen's mere presence in the territorial waters of the United States does not constitute an entry into the United States. United States officials picked up Chen before he reached the shore, and Chen has not been freed from this official restraint. Because Chen never officially entered the United States, the INS properly brought exclusion proceedings, instead of deportation proceedings, against Chen. But see Xin-Chang v. Slattery, 859 F.Supp. 708, 713-15 (S.D.N.Y.1994) (holding that petitioner, another alien who jumped off the M/V Golden Venture and was picked up by authorities before reaching shore, might have effected an entry into the United States).
 
 V.
 
 53
 For the foregoing reasons, the decision of the district court is affirmed.[12]
 
 
 54
 AFFIRMED.
 
 
 
 [1]
 The grounding of the M/V Golden Venture off of Rockaway Peninsula in Queens received nationwide attention. The New York Times reported that approximately 90 Chinese immigrants boarded the ship in February 1993 in Bangkok, Thailand; the ship sailed to Singapore and then to Mombasa, Kenya, where 199 more Chinese immigrants boarded the ship. Steven L. Myers, Captain and Crew Charged in Voyage of Chinese to U.S., N.Y. Times, June 8, 1993, at A1. When the ship ran aground around 2 a.m., the hundreds of refugees on board jumped into the sea and tried to swim to shore. See Robert D. McFadden, Smuggled to New York: The Overview--7 Die as Crowded Immigrant Ship Grounds off Queens; Chinese Aboard Are Seized for Illegal Entry, N.Y.Times, June 7, 1993, at A1. The smuggling operation was run by a Chinese gang that charged up to $35,000 per person for passage to the United States. See id. Ten of the immigrants died before reaching shore. A 4th Body Is Discovered in the Waters off Queens, N.Y.Times, June 20, 1993, Sec. 1, at 12
 
 
 [2]
 Chen received 140 yuan per month as salary
 
 
 [3]
 As amended, the 1989 Act provided, in pertinent part, as follows:
 Sec. 3 STANDARDS TO BE APPLIED IN ADJUDICATING APPLICATIONS FOR ASYLUM, WITHHOLDING OF DEPORTATION, AND REFUGEE STATUS FROM CHINESE FLEEING COERCIVE POPULATION CONTROL POLICIES.
 (a) IN GENERAL.--With respect to the adjudication of all applications for asylum, withholding of deportation, or refugee status from nationals of China filed before, on, or after the date of the enactment of this Act, careful consideration shall be given to such an applicant who expresses a fear of persecution upon return to China related to China's "one couple, one child" family planning policy. If the applicant establishes that such applicant has refused to abort or be sterilized, such applicant shall be considered to have established a well-founded fear of persecution, if returned to China, on the basis of political opinion consistent with paragraph (42)(A) of section 101(a) of the Immigration and Nationality Act (8 U.S.C. Sec. 1101(a)).
 Emergency Chinese Immigration Relief Act of 1989, Sec. 3(a), H.R. 2712, 101st Cong., 1st Sess. (1989).
 
 
 [4]
 Apparently, the omission of the January 29, 1990 interim rule from the July 27, 1990 final rule was mere inadvertence. See Guo v. Carroll, 842 F.Supp. 858, 869 n. 20 (E.D.Va.1994) (citing an article describing the omission of the January 29, 1990 interim rule as "an example of the bureaucratic left hand not noticing what the bureaucratic right hand is doing"), appeal docketed, No. 94-1416 (4th Cir. Mar. 31, 1994)
 
 
 [5]
 The January 22, 1993 rule would have provided, in pertinent part, as follows:
 Sec. 208.13 Establishing refugee status; burden of proof.
 (b) * * *
 (1) * * *
 i) An applicant (and the applicant's spouse, if also an applicant) shall be found to be a refugee on the basis of past persecution on the basis of political opinion if the applicant establishes that, pursuant to the implementation by the country of the applicant's nationality or last habitual residence of a family planning policy that involves or results in forced abortion or coerced sterilization, the applicant has been forced to abort a pregnancy or to undergo sterilization or has been persecuted for failure or refusal to do so, and that the applicant is unable or unwilling to return to, or to avail himself or herself of the protection of, that country because of such persecution.
 (2) * * *
 (ii) An applicant (and the applicant's spouse, if also an applicant) shall be found to be a refugee on the basis of a well-founded fear of persecution on account of political opinion if the applicant establishes a well-founded fear that, pursuant to the implementation by the country of the applicant's nationality or last habitual residence of a family planning policy that involves or results in forced abortion or coerced sterilization, the applicant will be forced to abort a pregnancy or undergo sterilization or will be persecuted for failure or refusal to do so, and that the applicant is unable or unwilling to return to, or to avail himself or herself of the protection of, that country because of such fear.
 
 
 [6]
 In relevant part, 8 C.F.R. Sec. 3.1(h)(1) provides as follows:
 (h) Referral of cases to the Attorney General. (1) The Board shall refer to the Attorney General for review of its decision all cases which:
 (ii) The Chairman or a majority of the Board believes should be referred to the Attorney General for review.
 
 
 [8]
 C.F.R. Sec. 3.1(h)(1)
 
 
 [7]
 Chen also argues that President Bush issued Executive Order 12,711 pursuant to the President's authority, under 8 U.S.C. Secs. 1101(a)(42)(B), 1157(a) and (b), to confer refugee status on specific persons in special circumstances. We reject this argument because section 4 of Executive Order 12,711 clearly refers to the Attorney General's powers to grant asylum under 8 U.S.C. Secs. 1101(a)(42)(A), 1158(a)
 
 
 [8]
 The January 29, 1990 interim rule has also been characterized as an interpretive rule. See Guo, 842 F.Supp. at 869 (stating that the January 29, 1990 interim rule "was apparently an interpretive rule"). Although we characterize the interim rule as a general statement of policy, we recognize that the result is the same whether the rule is characterized as an interpretive rule or a general statement of policy
 
 
 [9]
 We note also that the Attorney General also promulgated the January 29, 1990 interim rule without providing notice or an opportunity for comment. If the interim rule were a substantive rule, it would have been invalid from the date of its issuance for failure to comply with the notice requirements under 5 U.S.C. Sec. 553
 
 
 [10]
 The district court did not reach the issue of whether the January 29, 1990 interim rule required the Board to grant asylum to Chen because it concluded that Chen did not raise the issue before the Board and therefore failed to exhaust his administrative remedies. However, Chen did argue before the Board that Executive Order 12,711 required the Board to grant asylum to Chen, and the Executive Order expressly referenced the January 29, 1990 interim rule. For this reason, Chen may have implicitly raised the issue of the January 29, 1990 interim rule. Because we have concluded that the interim rule no longer has validity in light of its revocation by the July 27, 1990 final rule, we need not decide whether the district court correctly determined that Chen failed to raise the issue before the Board
 We note also that Chen did not argue before the Board nor before this Court whether the unpublished January 22, 1993 rule required the Board to grant asylum to Chen. Therefore, we do not reach this issue. A number of district judges have considered whether to enforce the January 22, 1993 rule even though it was not published; all but one has found the rule unenforceable. Wang v. Slattery, 877 F. Supp. 133, 138-40 (S.D.N.Y.1995) (Haight, J.); Dong v. Slattery, 870 F.Supp. 53, 59 (S.D.N.Y.1994) (Mukasey, J.); Lan v. Waters, 869 F.Supp. 1483, 1489 (N.D. Cal.1994); Gao v. Waters, 869 F.Supp. 1474, 1480 (N.D.Cal.1994); Chen v. Carroll, 866 F.Supp. 283, 287 (E.D.Va.1994), appeal docketed, No. 94-1416 (4th Cir. Mar. 31, 1994); Si v. Slattery, 864 F.Supp. 397, 402-05 (S.D.N.Y.1994) (Cedarbaum, J.); Chen v. Slattery, 862 F.Supp. 814, 822-23 (S.D.N.Y.1994) (Sifton, J.). But see Xin-Chang v. Slattery, 859 F.Supp. 708, 711-13 (S.D.N.Y.1994) (Patterson, J.) (holding January 22, 1993 rule to be enforceable).
 
 
 [11]
 The Supreme Court concluded that the refusal to join the guerrillas did not in itself demonstrate a political opinion against the guerrillas' cause. Id. at 480-83, 112 S.Ct. at 815-16. A person might resist recruitment for a number of reasons other than political opposition, such as "fear of combat, a desire to remain with one's family and friends, a desire to earn a better living in civilian life, to mention only a few." Id. at 482, 112 S.Ct. at 816
 
 
 [12]
 We note that during the preparation of this opinion, the Fifth Circuit issued a one-page opinion in Zheng v. INS, 44 F.3d 379 (5th Cir. 1995), which reached the same result as the decision herein