RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0137p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UWE ANDREAS JOSEF ROMEIKE, et al.,
                                *Petitioners*,

          *v.*

                              No. 12-3641

ERIC H. HOLDER, JR.,
                          *Respondent*.

On Petition for Review of a Decision
of the Board of Immigration Appeals.
Nos. A807 368 600–606.

Argued: April 23, 2012

Decided and Filed: May 14, 2013

Before: GILMAN, ROGERS and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael P. Farris, HOME SCHOOL LEGAL DEFENSE ASSOCIATION, Purcellville, Virginia, for Petitioners. Walter Bocchini, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** Michael P. Farris, James R. Mason III, HOME SCHOOL LEGAL DEFENSE ASSOCIATION, Purcellville, Virginia, for Petitioners. Margot L. Carter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.

     SUTTON, J., delivered the opinion of the court in which GILMAN and ROGERS, JJ., joined. ROGERS, J. (pg. 11), delivered a separate concurring opinion.

_____

## OPINION

_____

     SUTTON, Circuit Judge. Uwe and Hannelore Romeike have five children, ages twelve, eleven, nine, seven and two, at least at the time this dispute began. Rather than send their children to the local public schools, they would prefer to teach them at home,

1

largely for religious reasons. The powers that be refused to let them do so and prosecuted them for truancy when they disobeyed orders to return the children to school. Had the Romeikes lived in America at the time, they would have had a lot of legal authority to work with in countering the prosecution. *See Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 400–01 (1923).

But the Romeikes lived in Germany when this dispute began. When the Romeikes became fed up with Germany's ban on homeschooling and when their prosecution for failure to follow the law led to increasingly burdensome fines, they came to this country with the hope of obtaining asylum. Congress might have written the immigration laws to grant a safe haven to people living elsewhere in the world who face government strictures that the United States Constitution prohibits. But it did not. The relevant legislation applies only to those who have a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). There is a difference between the persecution of a discrete group and the prosecution of those who violate a generally applicable law. As the Board of Immigration Appeals permissibly found, the German authorities have not singled out the Romeikes in particular or homeschoolers in general for persecution. As a result, we must deny the Romeikes' petition for review and, with it, their applications for asylum.

I.

German law requires all children to attend public or state-approved private schools. The Romeikes feared that the public school curriculum would "influence [their children] against Christian values." A.R. 478. When the parents chose to homeschool their children, the government imposed fines for each unexcused absence. When the fines did not bring the Romeikes in line, the police went to the Romeikes' house and escorted the children to school. That strategy worked—once. The next time, four adults and seven children from the Romeikes' homeschooling support group intervened, and the police, reluctant to use force, left the premises without the children.

The school district returned to a strategy of imposing fines rather than force. It prosecuted the Romeikes for, and a court found them guilty of, violating the compulsory-attendance law, leading to still more fines. The prosecution and the mounting fines were the last straws, and the family moved to the United States in 2008. At the time of their departure, they owed the government 7,000 euros or roughly $9,000.

The Romeikes entered the United States through a visa waiver program. Uwe applied for asylum, and his wife and five children sought relief as derivative applicants. An immigration judge approved the applications after finding that the Romeikes had a well-founded fear of persecution based on their membership in a "particular social group": homeschoolers. The Board of Immigration Appeals overturned the immigration judge's decision. It explained that "[t]he record does not show that the compulsory school attendance law is selectively applied to homeschoolers like the applicants." *Id.* at 5. It added that homeschoolers were not punished more severely than other parents whose children broke the law. It concluded by reasoning that, even if the German government had singled out people like the Romeikes, "homeschoolers" are not protected by the immigration laws because they "lack the social visibility" and "particularity required to be a cognizable social group." *Id.* at 7.

## II.

To obtain asylum, an individual must prove that he cannot return to his native country because of a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). In trying to meet this requirement, the Romeikes have not claimed on appeal that the German government has persecuted them in the past; they claim that the government will persecute them in the future if they return.

When it comes to showing that a foreign country's enforcement of a law will persecute individuals on the basis of religion, membership in a social group or for that matter any other protected ground, there is an easy way and a hard way. The easy way is available when the foreign government enforces a law that persecutes on its face along one of these lines. Then there is the hard way—showing persecution through the

enforcement of a generally applicable law. "[W]here the law that the native country seeks to enforce in its criminal prosecution is 'generally applicable,'" that usually will be the antithesis of persecution. *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1151 (6th Cir. 2010). One normally does not think of government officials persecuting their citizens when they enforce a law that applies equally to everyone, including the allegedly persecuted group and the officials themselves. That is why, generally speaking, "[p]unishment for violation of a generally applicable criminal law is not persecution." *Saleh v. U.S. Dep't of Justice*, 962 F.2d 234, 239 (2d Cir. 1992). Enforcement of a neutral law usually is incompatible with persecution.

But usually is not the same as invariably. Even "[g]enerally applicable laws," we have recognized, "can be the source of a petitioner's persecution" in some cases. *Stserba v. Holder*, 646 F.3d 964, 977 (6th Cir. 2011). The government, for example, might selectively enforce a neutral law, prosecuting some individuals but not others based on a protected ground or punishing some more harshly than others for the same crime based on a protected ground. *See Cruz-Samayoa*, 607 F.3d at 1151; *Abedini v. INS*, 971 F.2d 188, 191 (9th Cir. 1992). Or the government might enact a seemingly neutral law that no one would feel compelled to break except on the basis of a protected ground, say a law banning certain clothing worn only by a discrete religious group or a law "outlaw[ing] the display of the American flag." *Beskovic v. Gonzales*, 467 F.3d 223, 226 (2d Cir. 2006). In either instance, if the applicant otherwise meets the requirements for establishing persecution, the fact that the government purported to enforce a generally applicable law would not immunize it from a charge of persecution.

This, however, is the hard way to show persecution, and regrettably for the Romeikes they have not shown that Germany's enforcement of its general school-attendance law amounts to persecution against them, whether on grounds of religion or membership in a recognized social group. Because the Board issued its own decision, as opposed to summarily affirming the immigration judge, we review its decision as the final agency determination. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). The Board's "findings of fact are conclusive unless any reasonable adjudicator would be

compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). And the Board's "decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law." *Id.* § 1252(b)(4)(C).

The Romeikes have not met these standards. Even assuming for the sake of argument that faith-based homeschoolers (or for that matter homeschoolers in general) are a cognizable social group, a matter we need not resolve, "[t]he record does not show that the compulsory school attendance law is selectively applied to homeschoolers like the applicants," or that "homeschoolers are more severely punished than others whose children do not comply with the compulsory school attendance law." A.R. 5. The petitioner's key witness, Michael Donnelly, testified that *all* parents who do not send their children to school face consequences ranging from fines to jail time to loss of custody. Donnelly identified parents punished for homeschooling their children for religious *and* secular reasons as well as parents punished for truant children who received no schooling at all.

The parents of Melissa Buzekros, for example, decided that it would be "better for her to learn at home." *Id.* at 272. Melissa's siblings continued to attend public school, but Melissa struggled due to "high noise levels and cancelled classes," prompting her parents to teach her at home. *Id.* at 587. In response, the government removed Melissa from her parents' custody—not to persecute her parents but to enforce the country's compulsory-attendance law. Other parents, too, have tried to homeschool their children for secular reasons, whether because they were "very unhappy" in public school, highly gifted or low performing, and they also were punished. *See id.* at 591–92 (affidavits of Tilman and Dagmar Neubronner) (explaining that they faced $9,500 in fines after trying to homeschool their kids who were "very unhappy" in public school); *id.* at 657–58 (affidavit of Jorg Grosselumern) (explaining that "people who would like to practice homeschooling" because of "educational needs of the child," such as being highly gifted or low performing, "do not dare to practice homeschooling actively because of the varied sanctions").

The parents of "school skippers," truant students who do not show up for school, face civil fines as well. If the parents fail to convince their children to go to school, the government places them in alternative learning programs or special schools for truants. This enforcement of the law has nothing to do with homeschooling, whether for faith-based or secular reasons. For better or worse, Germany punishes any and all parents who fail to comply with the school-attendance law, no matter the reasons they provide.

So far as the record shows, the only evidence of selective enforcement comes from a paragraph of an affidavit of a German lawyer, Gabrielle Eckermann. "In my experience," Eckermann says, the "parents of truant children are treated differently than parents who homeschool," as they often are "permitted to participate in home based distance learning or correspondence schools." *Id.* at 913. But the Romeikes' expert, Donnelly, acknowledged that the State runs the distance-learning programs for truant children, confirming that the State does not exempt them from a state-run education. And, as Donnelly also acknowledged, the State had ample reasons for distinguishing two groups of students: those not in school because their parents refuse to send them and those not in school in spite of their parents' best efforts to make them go. In the case of the latter, the parents do not violate the law; the children do.

All of this suggests that what seems to be true on the face of this neutrally worded law is true. "There is no indication," the Board permissibly found, that the German officials "are motivated by anything other than law enforcement. These factors reflect appropriate administration of the law, not persecution." *Id.* at 5.

Not so quick, the Romeikes say: Germany has granted exemptions to *some* parents from the compulsory-attendance law, suggesting selective enforcement. Yet Germany granted those exemptions only in "extraordinary circumstances," when for example the children are "simply incapable physically or mentally [of] going to school," *id.* at 913, or when the parents' occupations require them to "constantly change their abode," *id.* at 761. On the rare occasions when the government grants an exemption, the government often sends teachers into the children's homes, showing that the parents alone are not responsible for their children's educations. Any exemptions thus are

granted as a last resort, and even then only when state-approved schooling would necessarily require the "separation of the children from their parents." *Id.*

Also short of the mark are the Romeikes' other arguments. They claim that the Board overstepped its bounds in rejecting three fact findings by the immigration judge: that Germany applied the law selectively to homeschoolers; that the passage of the 1938 compulsory-attendance law was driven by animus toward faith-based homeschoolers; and that the government disproportionately punished faith-based homeschoolers under the law. They argue that the Board set aside the immigration judge's factual findings due to "deficiencies in the evidence" and "speculative" witness testimony, and, relying on *Tran v. Gonzales*, 447 F.3d 937, 943–44 (6th Cir. 2006), they claim that these justifications do not suffice. But the Board set aside these findings for a different reason—they were "clearly erroneous"—and *Tran* stands for no such proposition anyway. *See Nasser v. Holder*, 392 F. App'x 388, 391 (6th Cir. 2010). *Tran* identified three reasons why the Board had overturned the immigration judge's factual findings—including evidentiary deficiencies and speculative testimony—and concluded that it was not clear whether the Board had used clear error or de novo review. *Tran*, 447 F.3d at 944. The decision does not foreclose the possibility that a lack of evidentiary support in the record or an unpersuasive witness might justify treating an immigration judge's findings as clearly erroneous.

To the extent the Romeikes mean to argue that the Board applied the incorrect standard of review, that is wrong. The Board laid out the correct standard of review at the outset of its opinion—clear error, 8 C.F.R. § 1003.1(d)(3)—surveyed the factualrecord, often at great length, and concluded that the immigration judge's findings were "clearly erroneous," A.R. 6. In particular, the Board convincingly showed that the record simply did not support two "findings": that Germany selectively applied the law to faith-based homeschoolers and disproportionately punished them for violations.

The third finding by the immigration judge—that "animus" and "vitriol" underlay enactment of the law—has even less support. For one, the judge never said that Germany enacted this law based on animus toward faith-based homeschoolers or

homeschoolers in general. Nothing in the record, indeed, suggests that such groups existed in 1938. For another, the record does not include the language of the original law, the history that led to its adoption or any contemporary understanding of what motivated it, if indeed that could be identified with respect to a law supported by different legislators with different perspectives. For still another reason, the only "finding" the immigration judge made—that the law showed an "intolerant" effort to "stamp out" "parallel societies" that might arise if parents could teach their children at home—sets sail at such a high level of generality as to add little to the case. Any compulsory-attendance law could be said to have this effect. But that does not prove that this law, then or now, targets faith-based homeschoolers in general or the Romeikes in particular. If, as the Romeikes claim, the law emerged from the Nazi era, that would understandably make anyone, including the Romeikes, skeptical of the policy underlying it. But such a history would not by itself doom the law. The claimants still must show that enforcement of the law amounts to persecution under the immigration laws. They have not done so.

To a similar end, the Romeikes complain that Germany's compulsory-attendance law violates their fundamental rights and various international standards and thus constitutes persecution regardless of whether it is selectively enforced. Each argument shares an Achilles' heel: Asylum provides refuge to individuals persecuted *on account of* a protected ground. 8 U.S.C. § 1101(a)(42)(A). The United States has not opened its doors to every victim of unfair treatment, even treatment that our laws do not allow. *Stserba*, 646 F.3d at 972. That the United States Constitution protects the rights of "parents and guardians to direct the upbringing and education of children under their control," *Yoder*, 406 U.S. at 233; *see Pierce*, 268 U.S. at 534–35; *Meyer*, 262 U.S. at 400–01, does not mean that a contrary law in another country establishes persecution on religious or any other protected ground. And even if, as the Romeikes claim, several human-rights treaties joined by Germany give parents the right to make decisions about their children's educations, *see, e.g.*, International Covenant on Civil and Political Rights art. 18(4), adopted Dec. 16, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171; Universal Declaration of Human Rights, G.A. Res. 217 (III) A, U.N. Doc.

A/RES/217(III), art. 26(3) (Dec. 10, 1948), that by itself does not require the granting of an American asylum application.

Nor does *Perkovic v. INS*, 33 F.3d 615 (6th Cir. 1994), hold that a treaty violation on its own establishes persecution. Two Yugoslavian citizens of ethnic Albanian descent sought asylum after they were arrested and beaten for posting pro-Albanian propaganda and for participating in demonstrations in favor of Albanian civil rights. *Id.* at 616–17. Noting that the Board's conclusion that the Yugoslavians had not been persecuted "was directly contrary . . . to the manifest intent of Congress in enacting the asylum law," *id.* at 621, we held that the petitioners were refugees deserving of asylum. In doing so, we added in dicta that Yugoslavia's treatment of the petitioners violated international law, *id.* at 622, but that observation was neither a necessary nor a sufficient predicate to their status as refugees. Just as a petitioner cannot obtain asylum merely by proving an American constitutional violation, a petitioner cannot obtain asylum merely by proving a treaty violation.

As then-Judge Alito explained, "the concept of persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional. If persecution were defined that expansively, a significant percentage of the world's population would qualify for asylum in this country—and it seems most unlikely that Congress intended such a result." *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993); *see also Foroglou v. INS*, 170 F.3d 68, 72 (1st Cir. 1999) ("The asylum statute does not inflict on foreign governments the obligation to construct their own draft laws to conform to this nation's own highly complex equal protection jurisprudence.").

The question is not whether Germany's policy violates the American Constitution, whether it violates the parameters of an international treaty or whether Germany's law is a good idea. It is whether the Romeikes have established the prerequisites of an asylum claim—a well-founded fear of persecution on account of a protected ground. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992) (explaining that, even if the petitioner could prove he held a particular political opinion, he must also show that he would be persecuted "*because of* [his] political opinion" rather than

because he defied the guerilla army's general conscription policy); *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1342 (4th Cir. 1995) ("Even if the applicant can characterize his failure to comply with the population control policy as a political opinion, the applicant must still demonstrate that the government's actions or threats against the applicant, even to the extent those actions or threats involve forced abortions or sterilizations, were taken for a reason other than to enforce the population control policy.").

The Romeikes have not met this burden. The German law does not on its face single out any protected group, and the Romeikes have not provided sufficient evidence to show that the law's application turns on prohibited classifications or animus based on any prohibited ground.

III.

For these reasons, we deny the Romeikes' petition.

---

**CONCURRENCE**

---

ROGERS, J., concurring.  I join the majority opinion.

At one point in the petitioners' brief, they assert that "the sole question before this Court is whether Germany is violating binding norms of international law through its treatment of homeschoolers."  Petitioners' Br. 37.  Our role, however, is not that of an international court adjudicating Germany's obligations to other countries in respect of its own citizens.  Instead we sit as a court of the United States, enforcing statutes that implement some of the international obligations of the United States to other countries in respect of asylum applicants.  As explained by the majority opinion, those obligations are fully met in this case.